# J. H. L. TUCK

## *v.*

## JEROME F. DOWNING.

**1.** CHANCERY—*proof must correspond with bill.* A party can not make out one case by his bill and another by his proofs, but they must correspond to entitle him to relief in a court of equity.

2. FRAUD—*rescission of contract for misrepresentations.* To justify a court of equity in rescinding a contract of sale, it is not only necessary to establish the fact of misrepresentation by clear proof, but it must be about a material matter, or one important to the interests of the party complaining; for, if it was of an immaterial thing, or if the other party did not trust to it, or if it was a matter of opinion or fact equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other, there is no reason for equity to interfere to grant relief on the ground of fraud.

3. SAME—*materiality of misrepresentations.* Where a party is dealing with his own property and trying to effect a sale, he has the right to puff the same in the most extravagant manner,-and exalt its value to the highest point his antagonist's credulity will bear; and a false representation that it had cost $40,000, or that the vendor had given his obligation for that sum for it, where there is no relation of trust or confidence between him and the vendee, will not be regarded as material or so important as to constitute a fraud in legal contemplation, or entitle the vendee to rescind the purchase or recover back the difference between what he agreed to pay and what it cost the vendor.

4. SAME—*expressions which are matters of opinion.* On a bill to set aside a purchase of an interest in a certain mine in Utah, and for the cancellation of the note given for the price, on the ground of fraudulent misrepresentations of the quality and prospects of the mine, it appeared that the vendor went East to make sales of shares, and on his representations procured capitalists to appoint a committee to go and investigate, the purchaser acting with the others in the appointment, and the committee reported that the representations were true, and the vendor made extravagant declarations of the rich prospects, but made no warranty or guaranty, it was *held,* that such declarations could only be regarded as the expression of an opinion about a matter of which the committee could judge for themselves, and that they formed no ground for setting aside the contract.

5. SAME—*representations not relied on.* Where the representations relied on for setting aside a sale were necessarily a mere matter of opinion

as to the future prospects of a mine, equally open to both parties for examination, and the purchaser, through his agents, does make an examination by actual inspection and tests, the sale will not be set aside at the instance of the purchaser on the ground that the mine shall prove unprofitable, because the purchaser in such case deals on equal footing with the seller, relying upon his own judgment. If he places reliance on such representations, it is his own folly and indiscretion, against which the courts can not aid him.

6. If a purchaser, choosing to judge for himself, does not avail himself of the knowledge or means of knowledge open to him or his agents, he can not be heard to say that he has been deceived by the vendor's misrepresentations, for the rule is *caveat emptor*, and the knowledge of his agent is as binding on him as his own knowledge.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

This was a bill of complaint, in the circuit court of Cook county, exhibited by Jerome F. Downing, against J. H. L. Tuck, George A. Childs and Octavius Prince, the scope of which was to procure a cancellation of a promissory note executed by complainant to Tuck for five thousand dollars, and which Tuck had placed in the hands of Childs & Prince, bankers at Chicago, as collateral for a loan by them to Tuck of seven hundred dollars. The principal allegations in the bill of complaint are, that Tuck, in July, 1873, came to Erie, Pennsylvania, with Lucien P. Sanger, claiming to come from Salt Lake City, in the territory of Utah; that after they had been in Erie a short time, sojourning at the house of Irving Camp, then a resident, they endeavored to form a company to purchase a two-thirds interest in pretended mines, veins and lodes in the West Mining District in Salt Lake county, Utah, and to facilitate their purpose, Sanger and Tuck represented to complainant and to others that one Scribner, of Salt Lake City, owned an interest of two-thirds in two mineral veins or lodes, known as "Aqua Frio" and "Black Metallic" lodes, containing six hundred feet in each; and situated in the "West Mountain Mining District" in Salt Lake county, Utah, and certain other veins known as "Green Yankee," containing

thirteen hundred feet, adjoining the north-east end of the
"Black Metallic Vein," which interests Scribner desired to
sell, and offered them for sale for forty thousand dollars ; that
Tuck and Sanger represented that Sanger had a deed from
Scribner of this two-thirds interest, which Scribner had exe-
cuted to enable Sanger to give deeds to parties who might
purchase, to save the trouble of procuring deeds from Salt
Lake to be executed by Scribner. Tuck, in talking very freely
about the mines, and in his endeavors to sell and to induce
complainant and others to form a company to purchase and
work these mines, represented to complainant and others that
he, himself, had no interest in these mines, and that his only
object in coming with Sanger was as a professional attendant
and a practical and experimental geologist, and as one well
acquainted with mines and mining in the territories, and
therefore could speak more confidently as to these mines, and
that he came to explain the geological features of the country
and the character of the mines ; that they represented to com-
plainant and others that the mines were of great value, yield-
ing rich copper ore, with more or less gold ; that Sanger had
purchased from Scribner one-third interest therein, which he
bought to hold as an investment, and that Scribner would not
sell his remaining interest for less than forty thousand dol-
lars ; that on this visit nothing was effected, and the adven-
turers left Erie, but a short time afterwards Tuck returned
and again endeavored to induce complainant and others to
purchase this two-thirds interest, he, Tuck, having then and
there a deed purporting to have been executed by Scribner to
him for this two-thirds interest, he representing the deed was
executed to him on the condition he should go East and dis-
pose of the same for not less than five thousand dollars a share
of one-twelfth, and that he had given his personal obligation
to Scribner in the sum of forty thousand dollars to secure
Scribner out of the sales of these shares at five thousand dol-
lars for one-twelfth part thereof; that, by these representations
to complainant and others, named in the bill of complaint,

they were induced to form a company to purchase this two-thirds interest; and, as a further inducement to purchase, Tuck represented that no reduction in price could be obtained from Scribner, and he further represented to them that he was an experienced geologist, well acquainted with mines and mining in the territories, and with these mines in question, by which he could speak confidently as to their value, he then representing them to be of great value, yielding rich copper ore, with more or less gold, and assured complainant, if he would purchase a share, the profits immediately to result from their being worked, or within the first six months, would be large enough to enable him to pay for such share from the profits; that the mines could be depended upon for sufficient copper ore to keep one or more smelters in constant operation from the commencement, and that the profits would be large; that, relying upon these representations, complainant purchased of Tuck one undivided one-twelfth interest, and gave to him his promissory note for five thousand dollars, payable six months after date, upon which Tuck delivered to complainant a quit-claim deed from himself for this one-twelfth interest; that Tuck disposed of other shares, to-wit: to W. L. Scott one share, to I. Camp one share, to Noble two shares, and to M. R. Barr two shares—he, Tuck, pretending to divide Scribner's interest into eight shares, he selling seven shares and retaining one share to himself.

The bill then alleges that a company was then formed in Erie to work this mine, to smelt and sell ore and copper; that it was called "The Erie Mining and Smelting Company," but was not incorporated. It is then alleged the company took possession of the mines in August, 1873, and attempted working them, but found them wholly worthless; that complainant fully relied on all the representations of Tuck, and believed them true when he made the purchase and gave his note, but they were all false and untrue, and made by Tuck to cheat and defraud complainant out of his note; that, so far from being true, Scribner gave Tuck the deed for his two-

thirds interest in the mines on the understanding that he should go East and dispose of it for not less than five thousand dollars for an undivided one-twelfth part, and so far from its being true that Tuck had given his personal obligation to Scribner for forty thousand dollars, he had obtained Scribner's interest for a mere nominal value and without such an obligation; that the entire interest of Scribner could have been obtained for the amount of complainant's note; that Tuck well knew this at the time he made his representations; that he made them with intent to cheat complainant out of the note, he, Tuck, knowing all his representations to be untrue, and the mines to be worthless.

It is then alleged, so anxious was Tuck that complainant and the others should not know what he paid Scribner, or what Scribner had or would ask for his interest, that when one of the persons, to whom shares were sold, suggested to Tuck that a letter should be written to Scribner to see if he would not take less than forty thousand dollars therefor, Tuck immediately opposed the idea, asserting it was Scribner's best terms, and he had obligated himself to pay forty thousand dollars, and Scribner would not take a cent less.

The bill then charges that, in disposing of this stock to these members of the company, he unjustly discriminated in favor of certain members by selling to such interests in these mines on more favorable terms than he did to complainant, to the prejudice of his rights as a member of the company, and in violation of a common understanding as to the price to be paid by each member thereof purchasing from him, Tuck, and the note was obtained by fraud.

The bill then charges that, after obtaining the note, Tuck left Erie and was not heard from until the 13th of October, 1873, when complainant received a telegram from Childs & Prince, bankers in Chicago, asking if complainant's note to Tuck was all right, to which complainant replied it was not all right, and in three or four days thereafter complainant received a letter from these bankers to the effect that his

telegram did not reach them in time to prevent them advancing upon the note to Tuck seven hundred dollars, and that they held the note as collateral security therefor.

Answer under oath was waived. The prayer of the bill of complaint was, that Childs & Prince be restrained from buying this note and from selling, or in any manner disposing of the same, except to complainant, and if they had bought it in good faith, or had advanced money on it to Tuck, that they may be decreed to deliver to complainant the note upon payment by him of the amount advanced by them, and that complainant might be subrogated to their rights, and that they deliver up to complainant any notes of Tuck or other securities held by them from or against Tuck for this advancement, and that the note in question might be delivered up and cancelled, and for further relief.

An injunction was allowed, and defendants Tuck, and Childs & Prince, filed their answers, the latter stating, in substance, the receipt and possession of complainant's note, that they had advanced seven hundred dollars upon it without notice of any infirmity in it, and held it as collateral security therefor. They admit having in their possession some silver mining stocks received from Tuck, and will present a list of the same when required by the court, and have no other property of Tuck.

Tuck answered the bill at length, and in detail, in which he gives his version of the transaction; admits the visit to Erie in July, 1873, where he endeavored to form a company to purchase a two-thirds interest in these mines, and admits he represented to complainant and others there that one Scribner, of Salt Lake City, owned a two-thirds interest in these mines, as alleged, and that he would sell this interest for forty thousand dollars, and that Sanger had a deed for that purpose; admits they spent some time in Erie; that he there represented he had no interest in the mines; that he came with Sanger as a professional attendant, he, himself, being a professional and practical geologist and acquainted with

mines and mining in Utah territory, and for that reason could speak more confidently of the character and value of these mines; that they (he and Sanger) represented that the mines were valuable, yielding rich copper ore, with more or less gold and silver, and that Sanger had an interest of one-third in these mines as an investment, and that Scribner would not sell his two-thirds for less than forty thousand dollars. He admits they then left Erie, and that he, Tuck, returned to that place on the 1st of August, 1873, with a deed from Scribner of his two-thirds interest, and represented to complainant and the others that it was executed to him to enable him to convey that interest to others, for not less than five thousand dollars for each share of an undivided twelfth part of the same, but denies that he represented to complainant or others of Erie that he had given his personal obligation to Scribner for forty thousand dollars, or other sum, as a guaranty that he would sell his interest for that sum and secure its payment by sales of shares, or otherwise, and denies making the representations to complainant or others of Erie, alleged in the bill.

He admits he did state to complainant, and others of Erie, that no reduction in price could be obtained of Scribner ; that the mines were of the capacity and value as alleged in the bill, and that he made such representations in order that complainant and the others might be induced to examine the mines themselves, and satisfy themselves, upon such examination, of their value, preliminary to the formation of such company for working the mines, and that all the representations made by him were true in every particular, and that the representations were so understood by complainant and the others to have been made for the only purpose of inducing them to examine the mines, and thereby ascertain if it would be advisable for them to embark in the enterprise ; that, thereupon, complainant and the others appointed a committee,. consisting of M. R. Barr and Irving Camp, to proceed to the mines and examine into their capacity and value—he, Tuck, promising to accompany the committee to the mines, which

he did; that the committee, when at the mines, examined them fully, and at defendant's suggestion they went to "Mammoth" and "Copperopolis" mines, at East Tintic, eighty miles from Salt Lake City, to examine those mines, in order to assure themselves of the character, value and extent of the mines in question, they being of the same general character of the mines in question, and so understood by this committee at the time; that after a critical examination by the committee of these Tintic mines, they returned to Salt Lake City and again went to the mines in question and made another thorough examination of them, and took ores from the mines and had them assayed to ascertain their richness and value; and, thereupon, the committee expressed themselves to be more than satisfied with the result of their investigation, and said to defendant and others that the mines were of greater value than had been represented to them by Sanger and Tuck at Erie; that the committee, whilst at these mines, made arrangements to purchase a favorable site for the company; that, shortly thereafter, the committee and defendant returned together to Erie, the committee reporting to the parties the result of their mission, and of their examination of the mines, to complainant and the others interested in the enterprise, and they reported to these persons that these mines were of great value, and better, in every respect, than had been represented.'

The answer then alleges that, upon this report of the committee on their return to Erie, the company was formed, composed of certain persons, among whom were complainant and defendant Tuck, for the purpose of purchasing Scribner's interest in these mines and operating the same; that complainant, relying upon the report of the committee so made, purchased of defendant one share, being one-twelfth, for five thousand dollars, executing his note at six months therefor, whereupon defendant executed to complainant a deed for such share. He denies that complainant was deceived by any representations made by Sanger or himself respecting these

mines, and did not rely upon the same, but did rely upon the report of the committee alone. He denies he obtained the deed from Scribner for five thousand dollars, or a mere nominal sum, or that he represented to complainant, or any one else, that he had given Scribner forty thousand dollars or any other sum, and denies all fraud. He admits leaving the note with Childs & Prince as collateral security for a loan of seven hundred dollars, and thereupon defendant entered his motion to dissolve the injunction.

At the March term, 1874, a general replication was filed, and the cause set for hearing at April term, 1874.

On the hearing, against the objections of defendant, the court permitted complainant to amend his bill by alleging an offer and willingness on his part to reconvey to the defendant all his interest in these mines, and title, conveyed to him by defendant by his deed.

A decree passed, as prayed in the bill of complaint, the note in question declared fraudulent and void, and to be "annulled, set aside and cancelled," and that Childs & Prince, upon the payment to them by complainant of the seven hundred dollars loaned defendant, and interest thereon, deliver the note to complainant, and that complainant reconvey the property to defendant, covenanting that he has done nothing to incumber it, etc.

Messrs. BROWNELL & MONTONY, for the appellant.

Messrs. WHEATON, CANFIELD & SMITH, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This is an appeal from the circuit court of Cook county, to reverse a decree entered in that court in favor of Jerome F. Downing against J. H. L. Tuck and others, cancelling a certain note executed by the complainant to the defendant Tuck, for certain mineral lands in Utah territory, sold and conveyed by the defendant to complainant. The cause was

regularly set for hearing on bill, answer, replication, and proofs heard, and a decree passed as prayed. The defendant appeals.

It is unnecessary to consider the point made by appellant, questioning the right of the court to allow an amendment to the bill of complaint on the hearing, for, in our view of the whole case, appellee has no merits.

Appellee, under the second head of his brief, contends there are three elements of fraud in this transaction, or three classes of fraudulent representations; and, first, with regard to the price for which Scribner's two-thirds interest could be bought; second, the representation made by appellant to appellee that Camp and Scott had paid, each, five thousand dollars for a share, and that Noble had paid for two shares; and, third, the false representations made by appellant as to the character, quality and condition of the mines.

On the first point, there being no fiduciary relation between the parties, such a misrepresentation, if one, is not sufficient cause to rescind a sale. *Banta* v. *Palmer*, 47 Ill. 99. If the price alleged to have been paid, in that case, was thousands of dollars instead of units, the principle would be the same— that is not controlled or affected by figures. We also refer to 1 Story's Eq. Ju., secs. 199, 200; *Merryman* v. *David*, 31 Ill. 404.

But what are the real facts on this head? Scribner, through whom appellant claimed, was, with one Wood, the undisputed owner of the property in question, the legal title being vested in Scribner alone. He was an experienced miner and prospecter, and had sold to Lucian P. Sanger an interest of one-third in these mines, and they, not having the necessary capital, were desirous of finding those who had and were willing to invest, for the purpose of further developing and working the mines. Scribner was examined as a witness in this cause, and he stated, and it is not contradicted, that the first time appellant went East with Sanger, he (Sanger) had a deed, or some other writing, giving him the control of this

two-thirds interest, and he had given his obligation to pay nine thousand dollars therefor, in sixty days, or return the papers. There was no agreement between the parties as to the selling price to other parties. When they went East they were not acting for witness or Wood, but for themselves. No sales were made by Sanger at Erie, and he returned the papers to Scribner, who did, about the 24th of July, 1873, execute a deed to appellant for this interest. Appellant gave his obligation for nine thousand dollars, which recited if they did not get their pay in sixty days, they (Scribner and Wood) were to hold the mines—appellant was to recovey to them. At any time, Scribner testifies, their interest could have been purchased for ten thousand dollars. He further testified, when Barr and Camp (the committee) were at Utah, appellant had the sole right to determine the value for which this two-thirds interest should be sold. On the return of appellant to Utah, he paid Scribner for his interest, telling him the property had been sold for fifteen thousand dollars, saying, he and Sanger still retained an interest, but how much witness did not know—don't think they ever told him.

Upon this point appellant testified, that Mr. Noble asked him in his bank at Erie, the second time he was there, if he did not think if he (Noble) was to go to Utah, he could buy this property of Scribner for less money than appellant was asking for it. Appellant replied, " No, not a cent less," and this, as appellant testified, for the reason he had the deed for the property in his possession, and showed it to Noble, and said to Noble he had given Scribner his obligation. Appellant repeated this to the other parties, and showed to all of them the deed he had from Scribner, and told them he had given Scribner his obligation, not naming forty thousand dollars he had given, but that they could not purchase the mines for less than forty thousand dollars of Scribner, for it had ceased to be Scribner's property.

The pretense these parties were not dealing with appellant himself, but with Scribner through him, is put at rest by

6—76TH ILL.

this testimony and by the exhibition of Scribner's deed to appellant for this property, sold and conveyed to him, in consideration of nine thousand dollars. All this occurred after the return of the committee from Utah, and after they had made their report, and shows conclusively they were dealing with appellant as the owner of the property, which he, in fact, was.

Appellee testified, that appellant told him the contract for the sale of the mines had virtually been transferred to him. Appellee, then, before he bought, and executed his note, knew when he was trading with appellant he was negotiating with the real owner of this two-thirds interest, who made the representations he did make as owner of the property, eager to get the best price he could for it.

Now, when this deed to appellant, exhibited freely to appellee and all the other parties before the sale, showed on its face that the consideration paid or agreed to be paid by appellant was only nine thousand dollars, how could it be material if he did state he was bound to pay forty thousand dollars for it? There was the deed which appellee saw and read, expressing nine thousand dollars as the whole consideration. Can it be believed these parties could have been influenced by this declaration when they were confronted by the fact that nine thousand dollars was the price appellant had paid or was bound to pay Scribner? It is folly to urge that this statement of appellant influenced the action of appellee in any degree. It could not have been so, appellee being a man of business capacity, and the general Western agent of one of the most extensive corporations in the Union. Justice STORY says, if a party knows a representation to be false when made to him, it can not be said to influence his conduct; and it is his own indiscretion, and not any fraud or surprise, of which he has any just complaint to make, under such circumstances. 1 Story's Eq. Jur. sec. 202. Courts of equity do not aid parties who will not use their own sense and discretion upon matters of this sort. Appellant was

dealing with his own property, and had a right to "puff" it in the most extravagant terms, the other party being at full liberty to exercise his own judgment about it. There is nothing in the record to contradict appellant in these respects, and it must be taken as true. The deed spoke a language all could understand, and that informed these parties appellant had purchased the property for nine thousand dollars, and common sense should have taught them he had the right to sell it for as much as he could get for it, he himself occupying no fiduciary relation. *Banta* v. *Palmer, supra.*

It is not fair to say, as appellee does in his brief, that he was dealing with appellant as a partner, and between partners the utmost good faith must be observed. The evidence does not show this relation. A partnership is not the theory of the bill. Appellant owned this interest, and desired to divide it into eight parts, and sell as many parts as he could find buyers. When appellee bought one share, he became a tenant in common with appellant, and when the others purchased their shares, they also became tenants in common with appellant. There were no articles of co-partnership, verbal or written, no mutual responsibilities resting on these parties ; the proceeds of the sales of the several shares belonged to appellant as proprietor and not as a partner. Not being a partner in a partnership, appellant was not responsible to any of them, and is not accountable to his co-tenants for his acts of sale. Besides, appellee argues that appellant in this matter was acting as the agent of Scribner, and, as such, practiced the deceitful arts charged in the bill. If so, it is utterly impossible he could be a partner with appellee and the other purchasers, for he could not act for both. The whole case shows there was no relation whatever of trust or confidence between these parties ; but it does show appellant owned the property, and appellee bought one share after it had been thoroughly examined by a committee of gentlemen he aided in appointing, and without the least reliance on the

representations of appellant. We think the proofs show appellant was acting for himself alone, in this transaction.

Having disposed of the first element charged as fraud by appellee, the second will be considered—the representations made by appellant to appellee that Camp and Scott had each paid five thousand dollars for a share, and Noble had paid for two shares.

If appellee chose to rely upon such a statement, when these persons were his near neighbors, seeing them, possibly, every day, it was his own folly. But, as we understand appellee's testimony on this point, he said, before he gave his note, appellant said he had "closed up" with all the other parties, and delivered the deeds. Appellant did not say they had paid him, but that he had closed the matter with them by delivering the deeds. Had appellee desired fuller information on this subject, he could have inquired of the parties. But it is strange that a man of business and experience, such as appellee is, should place any reliance on such statements, and, whether true or false, it is impossible to believe they could have influenced the decision of such a man as appellee is represented to be; and it appears to us it was of no importance how appellant might dispose of this property, it being his own. How he closed up the matter with these persons, was no business of appellee, and concerned him in no possible way.

The third element of fraud, and one most worthy of consideration, is the alleged falsity as to the character, condition and quality of these mines. We have searched the record with great care for proof to sustain the charge of falsehood in this respect. In addition to what we have said in regard to the purchase of a mining interest, we will state the facts as they appear to us in the record.

It is not denied, when the committee went to the mines to examine them, they were treated with perfect fairness by Scribner, Sanger and appellant, and every aid afforded them to a full and satisfactory examination. The record shows all

their acts were in the utmost good faith, and prompted by a sincere desire to furnish all the information they could, before appellee and the others should make the purchase. What do the witnesses say on this point?

Scribner says, the committee examined the mines thoroughly. They took up the ore; they broke off pieces, and witness broke off some from different places in the mines. They took that ore and returned to Salt Lake City, with the intention of having it assayed, and told him afterwards they had it assayed. Scribner accompanied them to Brigham Canon and Copperopolis, to examine the mines there; were gone two or three days, and whilst in Brigham Canon they examined the Winnimuck mines. On their return they went again to these mines, took other specimens of ore, and examined the ground thoroughly, and told witness, when they got back to town, they got their assay certificates; and then Mr. Barr, in witness' room in Salt Lake City, said, they intended to take the mines, and that they were better than Sanger and appellant represented, and that he was more than satisfied, and if they "played out" there was no one to blame. Scribner further says, the committee went to examine the mines in the Tintic district, in order to compare them with the mines in controversy—that was what they said. They went away satisfied, when they examined the Tintic mines, that these they were about to purchase would turn out as well, judging from what they could see.

Mr. Camp, one of the committee appointed by appellee and his associates, testified : We examined these mines and their development, and took specimens of the ore therefrom to assay, and, on our return to Salt Lake City, left them with the assayer, John McVickar, for assay by him. We then went to the East Tintic mining district, to visit the mines known as "Mammoth," "Copperopolis," and "Chrisman Mammoth," which we inspected. These were similar in their ores to the mines we were intending to purchase. We then returned to Salt Lake City, and went from that place to visit

the Winnimuck mines in Brigham Canon. This last mine is
only one and a quarter miles from the mines which were the
subject of negotiation. On our return we made a second and
further examination of the out-crop of the veins or ores, and
of the ore in the openings and cuttings at or near the junc-
tion of the "Aqua Frio" and "Black Metallic" mines. We
then returned to Salt Lake City, where we obtained the re-
port of the assayers, and made examination of the abstract of
title of these mines, at the recorder's office, and returned to
Erie. On our return to Erie, the associates or parties spoken
of were called together, and our report made. The report
was, that we found the situation, surroundings and develop-
ment of these mines fully up to the representations made by
Sanger and Tuck, and the assay of the ores, on an average
assay, three or four per cent better than the assay Sanger and
Tuck had shown at Erie, and the title thereto reported we
found all right. Then a canvass commenced for getting up
the association for the purchase of shares, when appellee took
one, etc.

Appellant, in his testimony, states that his object in
visiting Erie was to interest capitalists there to such an
extent that they would send a committee to examine these
mines, and if they found them as good as represented, they
could have a two-thirds interest, at the rate of sixty thous-
and dollars, or five thousand dollars each one-twelfth.
Drew up a subscription list, embodying these facts and
conditions of sale. Among those who signed it was the
appellee. Met the committee appointed to examine the
mines, at Joliet, and proceeded with them to Utah. Took
them to the mines, which they carefully examined, made
measurements of the work done and of the amount of the
ore inside, and estimated the amount of the ore in the dump,
and they said the out-crop and the appearance of the indica-
tions of these mines were really superior to that of the out-
crop of the "Mammoth' and "Copperopolis." While at the
mines  the committee took a large number of samples of ore

from the mine, in different locations, and also from the dump, and brought them to Salt Lake City for assay. He further testifies, that Barr, on the next day, employed Scribner to go back to these mines and purchase another mine, called an extension of "Aqua Frio," which he did, Barr paying for the same by draft. The committee remained thereafter at the city one day, to attend to the assays, and went again with witness to the canon to buy a location for a furnace site. Met Scribner there. The ground was selected, and Barr authorized Scribner to buy it, which he did, taking deed to Barr; next day started for home. Barr left the train at Peru, for a short visit. Witness left at Joliet, promising to meet them at Erie at an early day, to perfect the papers. The committee were more than pleased with the mines. They made a written report from Utah about them, and at Erie a meeting was called and the report considered, and Barr then and there, having before his visit to the mines taken one share, said he would take two shares, and did so. A company was then organized, of which appellee was president. Appellee was to have paid cash for his share, but complaining of hard times, and that he had been purchasing real estate, asked indulgence of six months. Witness had employed nine men at the mines, and commenced taking out ore immediately, and piled on the dumps as much as one hundred and fifty tons, as he thought. It was measured, and amounted to more. Had business East, and left the mines in charge of Joseph Hicks, as foreman. When East, Mr. Barr, in November, about the middle, came out to the mines, which had been worked since August 20. By Barr's orders work was suspended entirely.

This witness fully sustains the others as to the favorable appearance of the mines.

Lucien P. Sanger was familiar with the mines, and corroborates all that has been said as to their flattering appearance. The assays averaged $23\frac{7}{10}$ copper, $70 in silver, and from five to eighteen dollars in gold, to the ton. He went to Erie to

get capital to assist in developing the mine, he owning one-
third of the whole; rode with Barr from Joliet to Chicago,
on his return from examining the mines, and conversed freely
with him; he said he had examined them thoroughly; had
been to Tintic and examined the mines there having the same
character of ore; that the prospects were better than he and
appellant had represented them; his opinion, as a miner, is,
that the mines should be worked by all means, the indica-
tions being there is there one of the biggest mines in the
country. Witness was a large owner in these mines, and had
paid all his assessments. On October 20, 1873, the drift was
120 feet; after going through barren ground a number of feet,
the rock was becoming very much stained; had it assayed,
and it went $403 to the ton in silver; believes these stains
indicate the biggest kind of mineral; regrets the work was
stopped, for the ground is not proved at all; stopped without
his knowledge or consent, without consulting him, while he
was absent in the States; it was bad policy to stop.

Experienced miners, well acquainted with these mines, tes-
tify the ores are copper, gold and silver producing ores;
from out-crop and outside appearance, the mine was very
large; such property worth sixty thousand dollars; in buying
and selling mines, people buy and pay, or agree to pay, accord-
ing to the prospect in sight; out-crop very flattering, show-
ing a large amount of mineral in sight in the open cuts and
strippings; the work done on them in August and September
done with very poor judgment; the tunnel was run accord-
ing to the stratification, when it should have been run to cut
the stratification, so as to cut the vein; acquainted with sim-
ilar mines in that vicinity, but with none with a prospect so
flattering as the mines in question; from the out-crop and ore
in the dumps, would consider the property worth from seventy-
five thousand dollars to one hundred thousand dollars; par-
ties purchase mines on the prospect, without warranty or
guaranty, and on the mineral in sight; there is no custom
requiring guaranty or warranty; Tuck is an honorable man, and

well posted on mining and scientific matters connected there-with; have a high opinion of the property from its showing; never been in Tuck's employment.

Another witness says, the finest prospect on the surface he ever saw; the out-crop indicated a very valuable mine; at the time this was sold, no mines were being sold in that vicinity of a similar kind; such a thing as a warranty of a mine on the Pacific coast is unknown; no custom of the kind; buy and sell on the ore in sight; several mines very valuable now there, lately discovered.

Joseph Hicks, an experienced miner, worked these mines two months for Scribner and three months for the Erie Mining and Smelting Company; ordered to quit work by Barr; prospect favorable, when he quit, of striking ore in paying quantities, but impossible to tell how soon; judged it bad policy to quit; impossible to tell the actual value of a mine by the prospect; indications good; met Camp and Barr at the mines; they examined the mine two different days; took samples of ore; when they visited it in July, 1873, the prospect was favorable for a large mine.

McVickar, the assayer, testifies the out-croppings of these mines are similar to those of the "Mammoth" and "Copper-opolis;" no guaranty is given as to the quantity of ores or minerals which will be produced from mines, in selling them; people buy from the prospect in sight; have made a great many assays from these mines, some for Scribner; and in August last made five for Barr and Camp; the average of those assays would be about $24\frac{1}{2}$ per cent copper, seventy dollars in silver and eleven dollars in gold per ton of two thousand pounds; gave these results to Barr and Camp.

This proof shows clearly that, at the time the sale was made, and this note executed by appellee, the mines were substantially as represented by appellant and Sanger, and the committee that examined them thought them even better.

Against this mass of testimony as to the appearance of the mines when sold to appellee and others, we have the testimony

of Wellington Downing, son of appellee, a young man about twenty-three years of age, who was sent out to the mines in August, 1873, who had no experience, and who, Sanger testifies, acted as cook to the hands, and took charge of the water supply, and sometimes the check roll of the men. He quit in November following, because no encouragement to proceed further—indications then very unsatisfactory.

Barr also figured as a witness for appellee. What he discovered on his second visit to the mines, in October, 1873, or how they appeared, has nothing to do with the decision of this case. The purchase was made on the faith of his report as one of the committee, in July previous. The proof, as we have seen, sustains the representations then made. Just before he made this second visit, the great money panic of September had produced dismay and trouble throughout all departments of business, and these gentlemen, though connected with large moneyed corporations, found it difficult to raise means. Money is the sinew of mining, as of war, and that supply failing, the mines were a fraud, and the whole thing a cheat and a swindle. It matters not how the mines turned out. If the prospect was as represented when appellant sold, the purchasers are bound to stand to the bargain.

Who are these purchasers complaining?

The complainant, Jerome F. Downing, is a man fortyseven years of age, residing in the important borough of Erie, in the State of Pennsylvania, and the general manager in the West of one of the most known and substantial insurance companies in the United States, known as "The Insurance Company of North America, at Philadelphia."

Orange Noble, another member of this Erie Mining Company, was fifty-six years of age, and president of the "Keystone National Bank of Erie."

Matthew R. Barr was fifty-six years of age, and had been, for a long time prior to this transaction, engaged in the iron foundry business. He was one of the committee to visit these mines in person. These persons were the principal witnesses

for complainant, and their testimony, at first blush, and without a careful examination, might tend to sustain some of the allegations in the bill of complaint. It is upon proof of these allegations, if they establish fraud, that relief can be had, and upon them only. A party can not make out one case by his bill and another by his proof—they must correspond. The nature of the subject bargained for, and what was sold; the character of the representations made, whether true or false, and if false, were they material; and how does the evidence preponderate, taking the whole case into consideration; and care must be observed in order to distinguish mere opinion from facts.

After a careful examination of this record, we are satisfied no false representation of facts is established against appellant, unless it be in respect to the amount he was to pay Scribner for his two-thirds interest in these mines, forty thousand dollars, and for which he had given his personal obligation. Appellant denies having made this latter statement, but in this he is contradicted by several witnesses, all interested, who testify he did so state. But we hold, admitting he did so state, it was of no importance. It was not a fraud in legal contemplation, there being no relation of trust or confidence between these parties, creating a duty resting on appellant to state the truth. It might be morally wrong, but the law can not lay hold of it. This doctrine was distinctly announced by this court in *Banta* v. *Palmer*, 47 Ill. 355. There, the plaintiff had paid defendant eighty-five dollars per acre for the land, on defendant's representation to him that he himself had paid that sum for it, when, in truth and in fact, he had paid but seventy-five dollars per acre for it. The court say, if no fiduciary relation existed between the parties, however wrong, morally, it may have been in the defendant to misrepresent the price he had paid for the land, the misrepresentation does not entitle the plaintiff to recover back the difference between what he had paid for the land and what it had cost the defendant.

These gentlemen trading for these mines were old and experienced men of business, mingling and taking active parts in the struggles of life, and it could be of no possible advantage to them, in determining how much they could risk in a speculation like this, what the seller had paid or was bound to pay for it. Besides, this representation could have had no effect when the deed from Scribner to Tuck, conveying his two-thirds interest, expressed a consideration of nine thousand dollars only. These parties purchased on the strength of this deed, as assuring Scribner's title to be in appellant for the consideration of nine thousand dollars.

If one has a horse, and, proposing to sell, shall assert that he paid one thousand dollars for him, when the bill of sale expresses a consideration of one hundred dollars only, it can hardly be said a purchaser of the horse for two hundred dollars, and that sum greatly above his value, can hope to rescind the contract on the ground of such a misstatement. The truth is, such statements by practical men, as these parties all are, are never regarded, and enter not into the conclusions they may reach as to the value of an article. Practical men, like these, act on their judgments of values. The declarations of appellant, that he had given his personal obligation to Scribner for forty thousand dollars, was to these business men but as the idle wind, the mere vaporing of one whose only object was to get a high price for an article he owned and desired to sell.

This court said, in *Miller* v. *Craig*, 36 Ill. 109, upon this question of fraudulent misrepresentation, the appellant, in endeavoring to effect a trade with appellee, used no more *artifice* than is usual and allowable where a party wishes to dispose of property, real or personal. He has a right to exalt the value of his own property to the highest point his antagonist's credulity may bear, and depreciate that of the other party. This is the daily practice, and no one has ever supposed that such boastful assertions or highly exaggerated description amounted to fraudulent misrepresentation or

deceit. The parties were dealing at arm's length and on equal grounds, and their own judgments were to be their guide in coming to a conclusion. It is proved that complainant had the fullest opportunity, of which he availed, to examine the property, and afterwards moved into it.

It will be remembered, the evidence shows, that no sale was effected by appellant on his first visit to Erie with Sanger. They went there for the purpose of procuring capitalists to embark in this mining enterprise, all of which are, in their incipiency, hazards which few besides practical men are willing to incur, and men who have money to invest. The world is full of such, no one of whom enters into associations of this nature with a certainty of ultimate success. Appellant, as a practical geologist, had freely and earnestly expressed to these people his convictions of the value of these mines, but he desired, before any investment was made, a committee should proceed to Utah, examine and report. A committee was raised, of which Barr, a man of great experience in the iron foundry business, was one. Mr. Irving Camp, also a prominent business man of Erie, was the other member of the committee, and they, with appellant, proceeded to these mines, examined them critically, went eighty miles further south, to visit the mines of East Tintic, to compare the ores of the mines controlled by appellant with the ores of these rich and productive mines. They returned and again visited these mines, again examined the prospect, broke off fragments of the ores, took them to a noted and competent assayer at Salt Lake City, to be assayed, who pronounced them such ores as had been represented, and as valuable, and the committee were well satisfied with the prospect and with the promises of rich returns. So much pleased was Mr. Barr with the appearance, that he purchased, on his own private account, an adjoining mine, for which he paid several thousand dollars.

The committee returned to Erie and made their report, in all respects favorable, though appellee testified it was not

satisfactory to him.  Yet he did, of his own free will, after the report was made, purchase one-twelfth interest, and executed the note in question therefor.  It is idle to say or pretend this report did not influence him, but the false representations of appellant did; that he relied upon them, and not upon the report of the committee.  But the truth is, the report of the committee sustained appellant substantially in the declarations he had made.  It is not proved he was guilty of stating anything which was not true, save and except as to his personal obligation to pay Scribner forty thousand dollars, and this, we have shown, was unimportant, and not such a deceit as the law forbids.

It is in proof that appellant rendered all the assistance in his power to the committee in their examination, and made to them many statements of the richness of the vein, its extent and value, and spoke of it as the mother vein of all this country; that there never was such a "blow-out" without there being a mammoth vein.  This was all matter of opinion on appearances visible to the committee men, and on which they could form their own opinions, and did so, and were satisfied with the prospect; so reported to appellee and their other associates; after which they executed their notes.

It is in proof that, in buying and selling mines, people buy and pay, or agree to pay for them, influenced by the prospect.  No man, however scientific he may be, could certainly state how a mine, with a most flattering out-crop or blow-out, will finally turn out.  It is to be fully tested and worked by men of skill and judgment.  Mines are not purchased and sold on a warranty, but on the prospect.  "The sight" determines the purchase.  If very flattering, a party is willing to pay largely for the chance.  There is no other sensible or known mode of selling this kind of property.  It is, in the nature of the thing, utterly speculative, and every one knows the business is of the most fluctuating and hazardous character.  How many mines have not sustained the hopes created by their out-crop!

The extravagant declarations of appellant after his return to Erie with the committee of examination, and made in their presence, that a silver mine with copper croppings was an inexhaustible mine of wealth ; that the "Aqua Frio" and "Black Metallic" were the biggest things in Utah ; that situated at the Fork Hills was greatly to their advantage ; that they were well developed mines, with well defined veins ; that he had never seen, in all his experience, such a "blow-out ;" that a furnace ought to be erected at once, as the ore could be mined, and all the money put into it could be got out in a few months—was mere gassing, and for the purpose of extolling what these men, through their committee, had seen, and could judge of the prospects and promise for themselves. There was nothing unlawful, or prohibited in law, in all this. It was after this examination and report by Camp and Barr the share was bought by complainant, and the note in question executed and a deed delivered and accepted for the property. It is impossible their statement should be regarded as anything more than opinions, for no man can tell how a discovery like this may result. Appellee could have understood them in no other sense, and the same may be said of the report of the committee. They were opinions founded on facts as they appeared to them.

Suppose, in the oil region, which is in the neighborhood of appellee and his associates, an explorer there had sunk a shaft out of which flowed ten barrels of oil in twenty-four hours, and in the next twenty-four hours twelve barrels, and continued to flow ten or twelve barrels a day, and he should extol it as the best well in all that region—should induce Erie capitalists to visit it, who go and see the flow, and are more than satisfied after a critical examination, and they return with the owner to report, and he again makes the most extravagant representations—asserts it is the mother well of all that country ; that there never was such a flow without there being an abundant supply ; that it would flow one hundred barrels in twenty-four hours, and it could be purchased

for ¹fifty thousand and no less; a company is formed, each taking one share at five thousand dollars; one of the associates is made president of the company, as this complainant and appellee was of the Erie Mining Company; should send his son, a young man without experience, to manage the well, and soon after one of the leading associates should visit the well and find it was flowing less than five barrels in twenty-four hours—could, under such circumstances, a court of equity interfere to rescind the contract on the ground of false representations? Where is the essential difference between the oil well and a mineral discovery? One is a liquid, the other a solid, and that is all the difference. In purchasing the oil well, they would buy from "the prospect," and no court would hold the extravagant assertions of the seller as anything more than gassing. The court would not hold them as statements of fact, but as opinions, which the fact, as it appeared, justified, or at least presented ground on which to base the statement. So in the sale of a mine. These exaggerated statements are always made, and a man's own natural judgment must be his counselor and guide. The great "Comstock" mine of Nevada, which has poured into the country its millions of silver, was bought and sold on the prospect, and for a few dollars. The discoverer could not pry into futurity; he took his chances for a few dollars, whilst those purchasing have a bonanza of scarcely appreciable value.

It is in proof the son of appellee, a youth inexperienced in mining operations, was sent out in August, 1873, to oversee these mines, and the operations to be performed there, and in October of that year Mr. Barr again went to the mines and was disappointed—gave it up as a bad job—thought they had been swindled; whilst Hicks, a practical miner in charge of the mines, and Tuck and Sanger, who owned an interest twice as great as any one of their associates, protested against quitting work, being well assured by perseverance their brightest hopes would be realized. In September, 1873, the great

money panic occurred, and it is quite probable these gentlemen's associates found it somewhat difficult to raise the money necessary to develop these mines fully, and because no rich vein was immediately struck they quit the matter in disgust, and now insist upon rescinding the contract on the ground of fraud!

Whilst writing this last paragraph, a newspaper article attracted attention. It was in regard to the recent discovery of a silver mine at Newburyport, in the State of Massachusetts, a locality where it was never supposed silver ore had a home. The statement was this :   "Six hundred feet of land on the Boynton lode were sold last week to a Springfield company for one hundred and sixty thousand dollars."  This purchaser has purchased on his judgment from the indications, as complainant did on the report of his committee.  Should this six hundred feet turn out to be a bad speculation, could the courts of Massachusetts be successfully invoked to rescind the contract, and have the  notes, executed for the purchase money, if that was the fact, given up to be cancelled ?  We fail to see any real difference in the cases.

We are familiar with the fact that there is a large class of cases in which courts of equity will grant relief where there has been a misrepresentation, or, as it is called, *suggestio falsi*. To justify such interposition, it is not only necessary to establish the fact of misrepresentation by clear proof, but it must be about a material matter, or one important to the interests of the party complaining ; for, if it was of an immaterial thing, or if the other party did not trust to it, or if it was a matter of opinion or fact equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other, there is no reason for equity to interfere to grant relief on the ground of fraud.  1 Story Eq. Jur. sec. 191.  The misrepresentation must not only be in something material, but it must be in something in regard to which the one party places a known trust and confidence in the other.   It must not be a mere matter of opinion equally
7—76TH ILL.

open to both parties for examination and inquiry, where neither party is presumed to trust to the other, but to rely on his own judgment. Matters of opinion between parties dealing upon equal terms, though falsely stated, are not relieved against. Thus, a false opinion, expressed intentionally, of the value of the property offered for sale, where there is no special confidence or relation, or influence between the parties, and each meets the other on equal grounds, relying on his own judgment, is not sufficient to avoid a contract of sale. Ib. sec. 197.

Again, it is said, nor is it every wilful misrepresentation of a fact which will avoid a contract upon the ground of fraud, if it be of such a nature that the other party had no right to place reliance on it, and it was his own folly to give credence to it; for courts of equity, like courts of law, do not aid parties who will not use their own sense and discretion upon matters of this sort. Ib. sec. 199. This is illustrated by a case at law, *Vernon* v. *Keys*, 12 East, 637, where a party, upon making a purchase for himself and his partners, falsely stated to the seller, to induce him to the sale, that his partners would not give more for the property than a certain price. It was there held, by Lord Ellenborough, that no action at law would lie for a deceitful representation of this sort.

Story thinks, 1 Story Eq. Jur. sec. 200, a court of equity, under like circumstances, would probably hold a somewhat more rigorous doctrine, at least if the party appeared to have been materially influenced by the representation, to his disadvantage, and if it did not avoid the contract, it would refuse a specific performance of it. But he says, in all such cases the court will not rescind the contract without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show the contract was founded upon them. He further says, section 200a : On the other hand, if the purchaser, choosing to judge for himself, does not avail himself of the knowledge or means of

knowledge open to him or his agents, he can not be heard to say that he was deceived by the vendor's misrepresentations, for the rule is, *caveat emptor*, and the knowledge of his agents is as binding on him as his own knowledge. Courts of equity do not sit for the purpose of relieving parties under ordinary circumstances, who refuse to exercise a reasonable diligence or discretion.

Of puffing and commendation of commodities this author says: However reprehensible in morals are gross exaggerations or departures from truth, they are, nevertheless, not treated as frauds which will avoid contracts. In such cases, the other party is bound, and, indeed, is understood, to exercise his own judgment, if the matter is equally open to the observation, examination and skill of both. Sec. 201.

These principles have been recognized by this court in several cases. To test this case by them, we have given a full statement of the leading facts.

That the prospect hanging over these mines in July, 1873, when appellee purchased, was as represented, the testimony is conclusive. The seller was not responsible for their condition or for their ultimate value at a future time. There was no warranty—no guaranty, and never is in such sales.

That this was a rich mineral region, we are informed by the report of Mr. Raymond, United States Commissioner of Mining Statistics, made to the Secretary of the Treasury in March, 1872.

In speaking of the "West Mountain Mining District," the *situs* of the mines in question, he says, among the numerous claims there may be mentioned the Winnimuck,—two thousand feet located—vein varies in width from a foot to $10\frac{1}{2}$ feet. The ore is argentiferous galena and carbonates. An English company paid $450,000 for the property. The mines are located at the head of Brigham Canon, and the claims cover several hills by being staked out on imaginary veins running in all conceivable directions. This ore contained only from four to thirty dollars in silver per ton. pp. 314, 315.

Speaking of the Tintic District, he says it is about seventy miles south-east of Salt Lake City.  It, as also the Winnimuck, was visited by Barr and Camp, the examining committee, and in the " Mammoth" there is a remarkable deposit of copper ore in limestone  cropping out upon the entire slope of a hill facing the broad and well-wooded  valley of the Tintic.  Much of the ore is ferruginous and  poor in copper, but there are masses of rich, dark colored ore, mixed with green and blue carbonates of copper.  Considerable quantities of this ore are shipped to Swansea, (in Wales.)  p. 317. The percentage of copper in the ores from these claims varies with the care taken in selecting.  From ten to fifty per cent may be regarded as a profitable range for the ore in shipping quantities.  A very considerable quantity will not run over eight per cent.  The value of silver is reported to be from twenty to one hundred dollars per ton.  P. 318.

The proofs show, by the assay of the ores of the mines in question, a greater percentage of copper and silver than these, besides eleven dollars in gold to the ton, so that as a speculation, which all such purchases are, they were worthy the attention of men of capital, eager for sudden and great wealth.

In this region is the celebrated "Emma" mine, one of the most remarkable deposits of argentiferous ore ever opened. Of it he observes, without any well marked croppings, there was nothing on the surface to indicate the presence of such a mass of ore, except a slight discoloration of the limestone, and a few ferruginous streaks visible in the face of a cut made for starting the shaft.  P. 321.

Mr. Barr need not have been discouraged when, in October, on his return to the mines, which had been improperly worked, by "the rock stained by carbonate of copper and chloride of silver," which he observed.  Hicks, the experienced foreman, however, was not discouraged, but as Barr and his associates had, by their shares, a controlling influence, the works were injudiciously abandoned.  But this does not affect appellant's claim nor determine his rights, as we

think he has maintained, by proof, all material statements made by him, and which were confirmed by the report of the committee on which, we are bound to believe, appellee acted.

These mines, like all others, were sold on the appearance —on the prospects, as they appeared to Camp and Barr when they visited them in July, 1873. Like an oil well flowing ten or more barrels in twenty-four hours, encouraging the hope it would flow one hundred or more in the same time, and so continue, but is exhausted in a few days, no reason for a cancellation of a contract for its sale can possibly exist. So with a copper mine, or any other mine.

These parties may have made a bad speculation, but as this court said, in *Walker* v. *Hough*, 59 Ill. 375, to justify a court in rescinding a contract executed by both parties, on the ground that one of the parties was induced to enter into it through fraud practiced by the other party, the testimony must be of the strongest and most cogent character, and the case a clear one. Appellee may be a loser by engaging in this speculation, but he did so uninfluenced, as we believe, by any misrepresentations of appellant. It is not for every losing bargain a court of equity will interpose to relieve.

The decree of the circuit court is reversed and the cause remanded.                          *Decree reversed.*