## Daniel H. Tolman v. Thomas W. B. Murray.

1. FRAUDULENT REPRESENTATIONS—*Negligence and Inattention.*—The law will not extend its protection to those who, through negligence or inattention to their business, suffer an advantage to be taken of their credulity.

2. SAME—*Relief in Equity.*—It is not for every losing bargain that a court of equity will interpose its relief. It is only such representations as a man of ordinary prudence will be likely to rely upon, which can be a ground of relief in equity.

3. SAME—*Must be of Existing Facts.*—Fraudulent representation in sales must be of existing facts, material to the value of the thing bought, and not mere prophesy.

MR. JUSTICE WATERMAN, dissenting.

4. VENDOR AND VENDEE—*Statements as to Value.*—Statements as to value of property are not as a rule representations of such a nature that a vendee can rely thereon, and hold the vendor to make the same good. To this rule there are exceptions, as, in the sale of goods by an expert, statements in respect to them and their value, made to one whom the vendor knows to be unacquainted with such value, and whom he is aware relies upon the truthfulness of such statements, are representations which the vendor is bound to make good.

5. SAME—*Ignorance of the Vendee Known to Vendor.*—Where the vendee is wholly ignorant of the value of property and the vendor

Tolman v. Murray.

knows this, and also knows that the vendee is relying upon his representations as to the value, and such representations are not a mere expression of opinion, but made as statements of facts, which the vendor knows to be untrue, such statements are representations by which the vendor is bound.

Memorandum.—Bill for relief. Appeal from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the March term, 1894. Reversed and bill dismissed. Opinion filed June 2, 1894.

MOSES, PAM & KENNEDY, attorneys for appellant.

WEIGLEY, BULKLEY & GRAY, attorneys for appellee.

MR. JUSTICE GARY DELIVERED THE OPINION OF THE COURT.

Condensed, the appellee's version of this case amounts to this:

The parties became acquainted in 1887.

The appellant was president of the Chicago Trust and Savings Bank, from which appellee had borrowed $1,000, which was yet unpaid, when the appellant called upon the appellee and told a flattering tale. What rate of interest was paid on that $1,000 we fail to find; but as subsequent transactions seem to have been in substance on the basis of two and one-half per cent per month, probably that was the rate.

To present the case of the appellee in its best aspect, we copy from the brief of his counsel:

" The record shows that several times, at least three, prior to the completion of the sale, Tolman went to see Murray. He went to see him at his place of business in Chicago. Except as informed by Tolman, Murray had never heard of the Midland company, and he knew nothing about the value of its stock, its organization, its objects or its purposes. Tolman was the president of the Chicago Trust and Savings Bank, a bank so far as Murray then knew, in good standing, and here is what Murray says with regard to the conversation:

I had three or four conversations, running over a period of three weeks, in April, 1888, in my office in Chicago. The

first time he said to me he was getting up a company to enable business men like myself, and others whose names he mentioned, who had to borrow money on short time, to borrow that money at the same rate of interest as bank interest—six per cent; and he said he was getting up this company or guarantee fund; that it was a kind of mutual company on the order of building and loan associations; that is, that all members could borrow at this low rate; that is; that a member had to be a member of the company to borrow at all. And then he went to work on paper to show me how I would be able to borrow at this low rate of six per cent, although I paid one per cent a month to the Midland company for guaranteeing the note, and that his bank, the Chicago Trust and Savings Bank, or any other bank in the city, would discount the note after being guaranteed by this Midland company.

Q. Can you state any of the elements that entered into the computation?

A. No; I would not undertake to figure out how he made it come out. He figured it out to my satisfaction that it was feasible, and I told him at the same time that I didn't need to go into it; that I didn't need to borrow money in that way; I could get all the money I needed at my bank. Then he said it was a profitable investment any way; that there were other men in it that did not need to borrow money. He mentioned some names; one was Joseph Stockton. I knew him and had known the firm for years, and that gave me confidence. He mentioned three or four furniture men in the city that I knew; one was Cogswell, on the west side, and another one was on Randolph street, and one by the name of McDonald. These were men I knew personally. He told me that it was a good investment, because it would pay twenty-five per cent dividend on the money invested. He figured it up, but I can't figure it. He said it would at any rate give twenty-five per cent.

He said he was getting up a company, and showed me a list of names he had. He was then the president of the bank. He said the stock was well worth all that I was paying for

Tolman v. Murray.

it; I paid $1,500; ten shares, $150 a share. He said I could sell it for that if I got tired of my bargain; that he himself would buy it back at that figure. He has promised that twice since. That is all that I remember. He said the business of the Midland company was to guarantee the notes of its members, so that they could borrow money at a low rate of interest. Afterward we had another conversation, when I found that they were paying no dividends. It was near meeting time, and when they decided they couldn't pay the dividend I wanted to sell my stock. He said, come in the spring and I will buy it of you. He said he had all the Midland stock he wanted to carry then. I went in the spring, but he refused to buy. I offered to give him my stock at $1,500, to pay off the two notes that he had against me in the bank, and $500, $2,000 in all. I was willing to forego the interest if he would take the Midland stock. He refused to accept. Six months after the issuance of the stock I had a talk with him; I asked him at the bank how the Midland company was getting on, and he said well, and would pay twenty-five per cent dividend. That was all. My notes were not all paid then."

Again: " In all the renewals my transactions were carried on with Tolman at the bank; I believed what Tolman said, or I would not have gone into it at all; I didn't know anything of the Midland company, except what Tolman told me."

On cross-examination he said : "When Tolman called on me to join the Midland company, it was without prior arrangement. I did not meet him on the street, and I didn't ask him to call at any time. When he called he said he was getting up a company to accommodate such men as me needing money on short time, on the mutual principle of building and loan associations. He called two or three times afterward; the last time I agreed to take stock. These conversations took up about three weeks. I made no examination in reference to the Midland company; I took Tolman's word."

" Q. Then the question of paying twenty-five per cent

dividend, the amount they would pay, was just as open to you as to him, wasn't it? A. I supposed that he would know more about it than I would; I made no inquiry; he figured out what he could do and would do; I was satisfied with the figures he made, but I don't remember how he did it; I took his say-so for it; he persuaded me to join the company, and I believed what he said; I supposed him to be the biggest stockholder; I know it was a company organized for the purpose of guaranteeing commercial paper of its members, as it was represented to me."

George T. Thompson, the book-keeper of Murray, testified: " I am book-keeper for Murray & Company, or Mr. Murray; I know Tolman since I saw him in the office of Murray & Company, two or three times when he talked to Mr. Murray; the last time he was there Murray called me and said: ' Now, Mr. Tolman will show you how this is figured out.' Murray told me about this before; I went to the desk where they were sitting; he had a pencil and a piece of paper, and said: ' You know how the building and loan associations work; the idea is like this: there is a number of people get together and become members; we loan this money to the members, and then it comes back ultimately;' he said they were profitable, yielding generally about twenty-five per cent; in that way it is quite profitable; the payments come quite reasonable, so you do not notice it. He said, if you are a member of this, it does not cost you any more to borrow money than the ordinary bank rate of interest; he said of course it was very profitable, and like building and loan associations; I did not hear all the conversation at that interview; Murray had quite a conversation before and after."

The foregoing is some of the evidence directly upon the question of the fraudulent statements and representations by which Murray was induced to purchase the stock. There is much other evidence in the record corroborating this which space forbids us quoting here.

The Midland company was chartered, as expressed in its articles, " to secure information and furnish statements concerning the responsibility of persons and corporations, to

conduct a merchandise commission business, and to contract in respect thereto." The application was filed with the secretary of state, March 7, 1888, and the certificate of incorporation was filed July 26, 1888.

It seems hardly credible that on this showing a manufacturer on a scale that required a book-keeper, in business in Chicago for twenty-two years, could have been induced to buy at $150, shares in a company as yet unorganized.

Without commending the morality of their exercise, we do not disguise our admiration of the fascinations of the appellant.

The whole case of the appellee, upon which he has obtained a decree which was intended to be one of rescission and restitution, stands upon the hypothesis that he was defrauded by false and fraudulent representations, and that hypothesis is based upon the assumption that in effect the appellant told the appellee that the Midland company was what it was not, i. e., a company organized—chartered—to guarantee commercial paper. All other supposed deceit is but prophecy.

First, the appellant made no such representation. On the appellee's own testimony the representation was that the business of the Midland company was to guarantee the notes of its members; and he adds as a summing up, " I knew it was a company organized for the purpose of guaranteeing commercial paper of its members, as it was represented to me," which is not a statement of what the representation was, but of what he knew from it. The representation of what the business of the company was, or, as the appellee seeks to have it understood, for what purpose it was organized, is no representation of what the charter is.

It is an ambiguous statement which the appellee has no right to rely upon as but of one construction. And even these representations, though expressed—if they were—in the present tense, related not to what existed then, but to what was going to be. They may have been promises, but are not statements of facts existing then. Hallows v. Fernie, L. R., 3 Ch. App. Ca. 467, 475.

Second, it is clear that a good charter, bad charter, or no

charter was of equal value to a company which proposed a profit by guaranteeing payment by borrowers who had not such credit or collaterals as warranted confidence by bankers in the promises to pay of such borrowers.

Loss in such business, if conducted in good faith, was inevitable.

If all the borrowers for whom the company would become liable, were to be members of the company, as the appellee says the appellant told him, and all the members were borrowers in the ratio of their stock, where would be the profit even if all paid?

Third, the misrepresentation was not such that care and prudence could not have provided against the deception; " the law will not extend its protection to those who, through negligence or inattent on to their business, suffer an advantage to be taken of their credulity."   Cooke v. School Com., 1 Gilm. 537.

" It is not for every lo ing bargain a court of equity will interpose to relieve."   Tu k v. Downing, 76 Ill. 71.

Only such representations as a man of ordinary prudence would be likely to rely upo i, can be a ground of relief. Grier v. Peterbaugh, 108 Ill. 6 2.

In Hicks v. Stevens, 121 Ill. 186, where the representations were as to an invention of an improvement in boilers, which case is relied upon by the appellee, the court say: Hicks was the inventor, and claimed to have made thorough tests of his invention, and presumably, had a greater knowledge of its use, capabilities, utility and value than any other person.

From these facts, and his profession of friendship to Jones, and of his desire to put him into a good paying business, we think Stevens and Jones not only relied upon the representations, but had a right to rely upon them, in making their purchase.   There, by construing the representations as stating results already proved by experience, the representations were of existing facts, material to the value of the thing bought.   No such element is here present.

An English judge expressing his surprise that people could

be taken in by such simple devices as a witness, a jockey, described, was answered by the jockey: "My lord, there is a fool born every minute, and, thank God, most of them live."

The law can not take care of them. Wightman v. Tucker, 50 Ill. App. 75.

The decree is reversed and the bill dismissed as to the appellant with costs.

Mr. Justice Waterman, dissenting.

If the only evidence in this case was that referred to in the opinion of the majority of the court, I should agree with the conclusion arrived at.

The findings of the master are sufficient to sustain the decree entered by the Circuit Court. The question before us is whether the evidence justifies such findings.

It appears that in 1885, appellant was the president of the Chicago Trust and Savings Bank, which bank had a capital of $200,000, of which appellant took $150,000, paying for it in cash; that in the fall of 1886 the stock was doubled, each stockholder being given two shares for the one he already held; that in 1886 appellant and some others conceived the idea of organizing a corporation whose business it should be to guarantee commercial paper; that appellant and others made an application to the secretary of state for a charter for a corporation authorized to guarantee commercial paper.

The secretary of state refused to issue such charter, whereupon a corporation known as the Midland company was organized by appellant. The object in the certificate of organization of said corporation, being stated to be to secure information and furnish statements concerning the responsibility of persons and corporations, to conduct a merchandise commission business, and to contract in respect thereto.

Appellant had before the organization of said Midland company, according to his own testimony, sold most of the stock thereof for $150 per share, being an advance of $50 upon the par value.

Appellee and about one hundred others were induced by appellant to subscribe their names to a paper reading as follows:

" The Midland company having been established, with a capital stock of $100,000, divided into 1,000 shares, we, the undersigned, hereby subscribe for and agree to purshase of D. H. Tolman the number of shares of stock of said company set opposite our respective names, paying therefor $150, and take delivery at the Chicago Trust and Savings Bank, May 5, 1888."

Appellee agreed to take said stock some time in April, 1888, and in the early part of May actually received from appellant certificates for ten shares of stock, giving to appellant his, appellee's, check for $150 and nine notes, each for the sum $150, payable in from one to nine months from date, and bearing interest at the rate of eight per cent per annum.

Appellant told appellee, in order to induce him to subscribe and take said stock, that the stock was worth $150 per share, and that the Midland company was organized for the purpose of guaranteeing commercial paper.

The Midland company was organized in May, 1888. Appellant subscribed for $50,000 of the stock, Floyd E. Jennison for $20,000, Messrs. Douglass, Brown and Werner for $10,000 each, and the stock was issued in accordance with the subscriptions to the respective subscribers.

This entire subscription was paid by appellant, and he, so far as Messrs. Jennison, Douglass, Brown and Werner were concerned, was the owner of all the stock, and appears always to have managed and controlled the Midland company entirely as he saw fit.

Very shortly after it was organized the Midland company purchased from the Trust and Savings Bank, of which appellant was the president, $50,000 of its stock, paying $62,500 therefor; this stock was then paid up to the amount of about sixty per cent of its par value.

Appellant seems to have sold, within two or three weeks, to about 125 different parties, nearly the entire stock of

the Midland company, in lots of from five to ten shares each, for $150 per share, such sales, as he himself testified, being made principally before the organization of the company; so that by the mere organization of the company he seems to have made a profit of about $50,000, selling all of the stock but about ten shares retained for himself, and, as is testified by the cashier of the Trust and Savings Bank and one of the directors of the Midland company, Mr. Jennison, appellant has, by purchasing and selling from time to time the stock of the Midland company, made a profit of from $150,000 to $200,000.

The Midland company charged one per cent per month for guaranteeing commercial paper, and the only paper that it guaranteed, save in one or two instances, was that upon which loans were made either by appellant or by the Chicago Trust and Savings Bank.

The Midland company for purposes best known to appellant declared several small dividends, but appears now not only to be insolvent but to have lost its entire capital.

I quite agree with the opinion, in part expressed by the majority of the court, that appellee did not use that care and caution which a prudent man who did not rely entirely upon the truthfulness of the statements made by appellant, would have used in purchasing the stock of the Midland company. Appellee does not seem to have made inquiry of any person as to the truthfulness of the statements made to him by appellant. The reason for this is apparent. Appellee had business relations with appellant. Appellant well knew that appellee trusted and relied upon him as a prominent business man at the head of a large financial institution, as the prospective organizer, president and principal stockholder in another large financial institution about to be organized, and at the time appellee paid his money and gave his notes for the stock of the Midland company, already organized, so far as the receiving of authority to incorporate and the making of a complete subscription to the stock was concerned, and that appellant was in a position to know what the value of the stock of the Midland company was, and of

necessity had a knowledge as to the value of such stock which no other person could obtain, except with the consent and by the assistance of appellant; appellee, therefore, in taking this stock, did as the ordinary business man, if he took the stock at all, would have done, viz., he took it relying upon the truth of what its president, organizer and principal stockholder said as to its value.

That the stock of the Midland company was worth upon its organization, or when appellee purchased, a premium of $50 per share, I do not understand is contended by appellant.

Appellant well knew in selling this stock to appellee that appellee was buying it relying entirely upon the truthfulness of his, appellant's, statements as to its value, and the purposes for which it was organized, and he knew such statement was false.

While it is undoubtedly true that as a rule statements by a vendor as to value are not representations, of a nature such that a vendee has a right to rely thereon, and can hold a vendor to make good the truth thereof, yet to this rule there are well recognized exceptions, as, in the sale of goods by an expert in respect to them and their value, representations made to one whom the vendor knows is not acquainted with the value of the article, and whom he is aware relies in purchasing upon the truthfulness of the story as to value told to him, is a representation which the vendor is bound to make good. So, too, where the vendee is wholly ignorant of the value of property and the vendor knows this, and also knows that the vendee is relying upon his, the vendor's, representations as to value, and such representation is not a mere expression of opinion, but is made as a statement of fact, which statement the vendor knows to be untrue, such statement is a representation by which the vendor is bound. Pomeroy's Eq. Juris., Secs. 878, 879; Pickard v. McCormick, 11 Mich. 68; Simar v. Canady, 53 N. Y., 298, 306; Henry v. Waldron, Supreme Court of Rhode Island, National Corporation Reporter, January 16, 1894, page 312; Allen v. Hart, 72 Ill. 104; McClellan v.

Scott et al., 24 Wis. 81, 87; Maxsted v. Fowler, 53 N. W. Rep. 921; Griffin v. Farrier, 32 Minn. 474; Townsend v. Cowles, 31 Ala. 428; Derrick v. Lamar Ins. Co., 74 Ill. 405; Bigelow on Fraud, page 496; Haygarth v. Wearing, L. R., 12 Eq. Cas. 320; Stover v. Wood, 26 N. J. Equity, 417; Prewett v. Trimble, 17 South W. Rep. 356.

As to the representations made by appellant concerning the purposes for which the Midland company was organized, this may be considered either as a statement of fact or as a statement of law. If meant as a statement of fact, it was untrue, because, to the knowledge of appellant, no permission or authority to guarantee commercial paper was contained in the authority to organize. If meant as a statement of law, and if appellant thought that under the authority granted by the State, the company would have power to guarantee commercial paper, still it was his duty in telling appellee the purpose for which said company was organized and the business it was to do, to tell him the entire truth, viz., that while appellant himself, as he claims, thought it could do such business, yet, the authorities of the State had distinctly refused to give him authority to organize a company, one of the objects of which was stated to be the guaranteeing of commercial paper. It is quite likely, if appellee had been told this, he might not have placed the implicit reliance he did upon appellant's statement as to what business the Midland company was authorized to do and would engage in.

Occupying the position and having the knowledge in this regard, which appellant did, it was his duty, when asking appellee to take stock, if he told him anything concerning the purpose for which the Midland company was organized and the business it would do, to tell him the entire truth. Moreland v. Atchison, 19 Tex. 303; Kerr on Fraud, page 90; Broadwell v. Broadwell, 1 Gil. 699.

The circumstances attending the organization and sale of the stock of the Midland company were so peculiar, the business it did so anomalous, its career so profitable to appellant and disastrous to the more than a hundred indi-

viduals whom he induced to take small amounts of its stock, its relations to the Chicago Trust and Savings Bank, of which appellant was the president and the largest stockholder, were so close, while, at the same time, from beginning to end, the management of this Midland company was so completely in the control of appellant, that I am led to the conclusion that the evidence sustains, for the most part, the conclusions of the master, and that the Midland company was organized and controlled by appellant, not for the benefit of its stockholders, but that appellant might, as he did, reap a rich harvest by dealing in its stock, and that the Chicago Trust and Savings Bank might make loans at usurious interest, thereby making great gain and losing nothing, so long as, in the exigencies of business, the assets of the Midland company were not exhausted by making good its guarantees, and that, by false and fraudulent representations, appellant induced appellee to purchase ten shares of the stock of said Midland company.