### Henry J. Burwash v. A. Percy Ballou et al.

#### Gen. No. 12,913.

1. FINDINGS OF FACT—*when by chancellor will not be disturbed.* Where a chancery cause is heard by the chancellor and the evidence is conflicting, the findings of such chancellor will not be reversed unless it is clear and palpable that he has fallen into error.

2. FALSE REPRESENTATIONS—*what do not constitute.* Representations, which are mere exaggerations, "puffing" or "gassing," do not always constitute such fraud as to justify the setting aside of a contract.

3. FALSE REPRESENTATIONS—*what do not constitute.* Statements of matters of opinion do not constitute false representations such as to justify the setting aside of a contract, even though the vendee had no opportunity or means of investigating and verifying such statements of opinion.

4. CORPORATE EXISTENCE—*when estoppel to deny, arises.* The appellant in this case, under the facts shown, is not in a position to claim that a *de facto* corporation, in which he purchased stock, had no legal existence.

Bill in chancery. Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in this court at the March term, 1906. Affirmed. Opinion filed April 4, 1907.

Statement by the Court. This appeal is from a decree of the Circuit Court of Cook county dismissing for want of equity a bill in chancery brought by the appellant against the appellees in that court. We shall for convenience designate the parties herein as complainant and defendants.

The bill was originally filed August 3, 1904, but was thrice amended, and as finally amended was answered by the defendants severally in August, 1905. The cause was tried on the amended bill, the answers and replications thereto and evidence heard in open court before the chancellor November 21, 1905, and following days, with the result indicated.

The prayer of the amended bill was that the defendants be enjoined and restrained from expending $1,400 in cash, alleged to have been paid with the notes hereinafter described, by complainant to the defendant Ballou, for seven thousand shares of stock in The International Copper & Gold Company, and from indorsing, transferring or negotiating certain promissory notes aggregating in amount $3,640, to the order of said Ballou, trustee, also on said purchase of stock, executed and delivered by the complainant, and that the said cash and notes be impounded by the court pending the final disposition of the cause, and that at the hearing thereof the said $1,400 in cash be returned to the complainant and said notes sur-

rendered and cancelled. The grounds of this prayer are allegations that the payments of said cash and the giving of said notes were secured from complainant by the false and fraudulent representations of the defendants and as the result of a conspiracy to obtain for their own use said money from the complainant. These false and fraudulent representations, it was alleged, were as to the value, validity and title of the stock to be purchased, and to the effect that the proceeds of the sale of a large amount of stock in the International Copper & Gold Company (of which that to be sold to complainant was a portion) were to be used for the benefit of said International Copper & Gold Company, and the development of the business of said company, whereas it was the secret purpose of the defendants, which was carried out, to use the said proceeds for their own uses and purposes.

The complainant alleged in his bill that he had, on discovery of the fraud and deception practiced on him by said defendants, at once rescinded his undertaking to purchase the seven thousand shares of stock, proffered back to defendant Ballou a paper purporting to be a certificate or agreement of such purchase and sale signed by the defendants, and demanded the return of the cash and notes described, which demand the defendants had not complied with, but had appropriated the $1,400 paid by complainant to the promotion of an enterprise individual to themselves and disconnected with the International Copper & Gold Company, and had threatened to use the notes in like furtherance of their own interests.

The defendants filed separate answers to bill and amendments, which, however, were practically identical in purport. They denied all the allegations of fraud and misrepresentation, and in effect denied that certain detailed matters set out in the bill and amendment came to the complainant's knowledge, as stated by him, shortly before the filing of his bill, but alleged that such matters were untrue and never came to his

knowledge, or, if true, came to it long before he filed his bill and the amendments to the same respectively. They alleged that the complainant had ratified and approved, by his vote at the annual meeting of the International Copper & Gold Company in 1903, the matters that he complained of in his bill.

They specifically denied that they made any false representations to the complainant, or any that they did not believe to be true, about the value of the stock to be purchased by him or the property represented by it, and that they made any representations to complainant regarding the purposes for which the proceeds of the sale of the stock to him were to be used. They admitted, as charged in the bill, that the seven thousand shares of stock had not been delivered to the complainant, and alleged the reason to be that the complainant had refused to pay the promissory notes given by him for the said stock, mentioned in the bill, all of which notes, except the last one, were overdue, and that said stock was held as security for said notes. They denied also that any money belonging to the company had been diverted or misused, and alleged that the bill was without equity and showed upon its face that if complainant had any grievance, he had an adequate remedy at law.

FRANK M. BURWASH, for appellant.

AZEL F. HATCH and LUCIUS W. WINCHESTER, for appellees.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

In this cause the appellant (complainant below) is seeking to rescind a contract into which he has entered, to pay for a large number of shares in a mining company, and to recover back certain money and notes which he has paid for it. He alleges that he was induced to make the investment by false representations

as to the character and prospects of the mines by the persons named as defendants, who were the promoters of the company and the beneficiaries of this sale of stock. The defendants deny making any such false representations, and declare that the company was and is an enterprise honestly conducted, and that the actions of the defendants in representations and reports of its prospects and in the sale of its stock were all designed for the good of all the stockholders, and that the purpose of the complainant is to set aside a speculative contract made with his eyes open, because it did not turn out as satisfactorily as he hoped. On these lines mainly the cause was tried below for several days before the chancellor on oral testimony heard in open court. This oral testimony was conflicting in material parts.

Under these circumstances it may be well to preface our opinion with two quotations which contain propositions necessary to keep constantly in mind in the de-·termination of the merits of this appeal. The first contains an often repeated statement of the force of the decision of a chancellor on conflicting testimony heard in open court:

"The testimony was conflicting and the conclusions to be drawn from it depended largely upon the credit which should be accorded to the different witnesses and to the weight and value of their testimony. The chancellor had, therefore, superior opportunities for forming an opinion of the relative merit and weight of the testimony given by the several witnesses, whom he saw and heard testify. When a chancery cause is so heard and the evidence is conflicting, the findings of the chancellor will not be reversed, unless it is clear and palpable that he fell into error." Arnold v. The Northwestern Telephone Co., 199 Ill. 201.

The second is the utterance of the Supreme Court upon representations of mining company promoters: "Courts of equity do not aid parties who will not use their own sense and discretion upon matters of this

sort. Appellant was dealing with his own property and had a right to puff it in the most extravagant terms, the other party being at full liberty to exercise his own judgment about it.   *   *   *   It is in proof that in buying and selling mines people buy and pay or agree to pay for them influenced by the prospect. No man, however scientific he may be, could certainly state how a mine with a most flattering outcrop or blow-out will finally turn out.   *   *   *   Mines are not purchased and sold on a warranty, but on the prospect. 'The sight' determines the purchase. If very flattering, a party is willing to pay largely for the chance. There is no other sensible or known mode of selling this kind of property. It is, in the nature of the thing, utterly speculative, and every one knows the business is of the most fluctuating and hazardous character. How many mines have not sustained the hopes created by their outcrop!   *   *   *   In purchasing an oil well they would buy from the prospect, and no court would hold the extravagant assertions of the seller as anything more than gassing. The court would not hold them as statements of fact, but as opinions which the fact, as it appeared, justified, or at least presented grounds on which to base the statement. So in the sale of a mine. These exaggerated statements are always made, and a man's own natural judgment must be his counselor and guide. The great Comstock mine of Nevada, which has poured into the country its millions of silver, was bought and sold on the prospect and for a few dollars. The discoverer could not pry into futurity; he took his chances for a few dollars, whilst those purchasing have a bonanza of scarcely appreciable value." Tuck v. Downing, 76 Ill. 71.

Applying to the case at bar the doctrines contained in these general statements, we must, in the first place, in support of the decree of the chancellor below, not only assume that he found as to all conflicting evidence on representations that the version of the matter put forward by the defendants was the correct

one, but we must also assume that it was in fact correct; and, secondly, we must be careful not to impute a fraudulent and wilfully misleading character to any matter, written or oral, which was merely exaggeration, puffing or "gassing," not made with intent to deceive, but as the exuberant and enthusiastic expression of an optimistic confidence in the future.

Under these rules, the complaints of the appellant fail to impress our minds, as they failed to impress the chancellor's below, as so substantial or well founded as to demand relief at the hands of a court of equity.

The complainant, Burwash, is a physician. In the spring of 1902 he had an acquaintance named E. L. Montgomery, who brought to his attention a mining company called The International Copper & Gold Mining Company, in which Montgomery said he was interested, and which he said was managed by trustworthy men, especially naming and praising the defendant Beaunisne. Dr. Burwash was not a "tenderfoot" in these matters. He testified that his experience in mining enterprises had been extensive and thorough, afterwards adding that he had had quite a little experience in buying "fake stock." He did not explain what he meant by this expression, but it may not be an unfair inference from the context that he meant stock which did not "pan out" as its hopeful holders had wished and perhaps expected, in the sense in which a holder of a lottery ticket often expects it to win a prize. Complainant did not, however, immediately risk anything in this enterprise introduced to him by Montgomery. But in the summer or fall of the same year E. L. Montgomery introduced Dr. Burwash to his brother, George A. Montgomery, who was by occupation a broker and dealer in mining stocks and so-called securities of that description. G. A. Montgomery had been connected for a year or more with the International Copper & Gold Company and another company of earlier organization, the capital stock of which was

held by the International Company. At the time of his introduction to Dr. Burwash he had recently returned from a stay of several months in Mexico, where he had gone to look after the property and the rights and interests of the International Company. He brought up the subject and recommended Dr. Burwash to invest, but the doctor replied that he had had enough of such speculations. E. L. Montgomery about this time gave the complainant a pamphlet which in glowing terms set forth the great prospects and values in various mines in Mexico, Colorado, and Montana, owned or controlled by the International Copper & Gold Company, and upon the title page bore the names of the officers and agents and of some employes of the company. The pamphlet was written in the usual enthusiastic style of such productions—well described in Tuck v. Downing, *supra*, as "gassing"—but Dr. Burwash, despite his experience in such matters, says he was much impressed with its statements. In consequence of them it would seem that he sought an opportunity to acquire stock in January, 1903. He called on George Montgomery and talked over the conditions connected with the financing of the company, the men who were connected with it and the prospects of its properties, and then called at the offices of the company and interviewed the defendant W. P. Ballou. As to what was said at this interview both Dr. Burwash and Mr. Ballou testified, and where their versions are contradictory, as in some respects they are, we must assume that the chancellor gave credence to the defendant Ballou. He says that, basing his statements on the reports of the superintendent in Mexico and upon assays of ore which had been made and on ore taken out of the Negra mine, he told Dr. Burwash that there had been ore taken from the mines in Mexico that had a value of from twenty to one hundred and twenty dollars a ton, and ran over the mines which the company owned in detail, undoubtedly enthusiastically. Everybody connected with the matter

seemed to be enthusiastic at that time. But no milling had commenced. Dr. Burwash testified that in the interviews with Ballou in January, 1903, the latter told him that they had bought a mill in Chicago and that the mill "was being shipped to Mexico from Chicago at that time," and he also testified that as late as July, 1903, when he bought the stock, the purchase of which he is now trying to rescind, he knew that no ore had been run through the mill, and that he knew it from Beaunisne and Ballou. With his experience in mining ventures, he must therefore have realized that the reports of superintendent or secretary about the richness of ore which had been secured must have been largely speculative—opinion and guess work. An assay of samples is a delusive thing, as all persons connected with mining know. Dr. Burwash, however, evidently had faith in the enterprise. He made an application for a thousand shares of stock at eighty cents a share, using therefor a blank, the terms of which will be alluded to hereafter in another connection, and paying $200 in cash. He received an agreement signed by Albert G. Beaunisne and A. P. Ballou, and dated January 12, 1903, undertaking to deliver to him a thousand shares of stock in the International Copper & Gold Company, upon payment of the balance of $600 in monthly payments of $200 each. The payments seem to have been made promptly, for the agreement in evidence shows that it was surrendered on the delivery of certificates of stock on April 10, 1903. Two other similar applications and agreements, involving in each case a thousand shares at the same price, bearing date January 30th, and April 10, 1903, were eventually carried out by the delivery of stock. As to the last there was some delay apparently in the payments, for the certificates of stock do not appear to have been delivered until December, 1903. Of these three executed contracts Dr. Burwash is not complaining, but of one subsequently entered into in July, 1903, and never completed.

Dr. Burwash seems to have taken a great interest in the company and business in which he had invested, for although unable because of professional duties to attend the annual stockholders' meeting of June 15, 1903 —to vote in which he constituted the defendants, Beaunisne and Ballou, his proxies—he was at the office of the company about twice a week from the time of his first purchases for several months. During that time reports of officers and agents of the company to the stockholders were printed and came into his possession. The first was in the form of a letter signed by Mr. Beaunisne, dated January 21, 1903, and addressed to the stockholders of the International Copper & Gold Company. It begins with a statement that the writer had recently visited the properties of the company in Mexico that he might have that familiarity with the situation which was essential to intelligent action and that he was accompanied by two stockholders and by Dr. Gibson, a chemist, metallurgist, assayer and mining expert. This document certainly gave roseate accounts of what turned out afterward to be very disappointing pieces of property—at least for the present— but a careful consideration and analysis of it do not make us think that it was conceived or put out in bad faith, or could properly, in its essential representations, have been received except as an expression of optimistic opinion from one who neither had nor pretended to have any expert knowledge.

The statements that are cited in the appellant's argument as examples of falsity, namely, "The company is served in Mexico by men of experience, integrity and good judgment," "It is my opinion from what I saw that the Pedregal is a five million dollar gold mine," "With the great and rich properties it" (the company) "possesses, their" (the stockholders) "investment cannot escape being a highly profitable one," are plainly matters of opinion, and would be so regarded by the simplest minded and least experienced of investors even. The statements concerning five

assays by different assayers of samples brought in by different parties at different times and from different localities on the property averaging $22.64 a ton, may "clearly imply," as the appellant urges, "that the average of the body of ore to be taken out of that mine is of a richness of $22.64," *in the opinion, hope and expectation of the writer*, but it certainly could not be construed as a representation of fact or a guaranty that the body of ore would be of that richness. Indeed, the writer afterward discounts, in making his predictions or calculations, one-third of this himself "for safety," and the reader who had much experience of prospective gold mines might well have thrown off most of the other two-thirds on the same account. Averages are always misleading, and it would occur to anyone, except a person whose mind was aflame with the thought of the wonderful chances which mining affords for lucky strikes, that there was quite as likely to be more ore like the sample which assayed $6.64 to the ton, than like that which assayed $41.74 to the ton. Both samples were reported in the table from which Mr. Beaunisne calculated his average, and if the items are true, which is not disproved, there was nothing approaching a misrepresentation in this statement of assays. The report also said this: "There was some question in the past as to whether sufficient water would be available here with which to operate an extensive plant, but during my visit water was struck in the mine, and careful investigation in the neighborhood demonstrated satisfactorily that there was plenty of water."

To the proposition that this statement was false, counsel cite us to Beaunisne's own testimony, in which he explains the intermittent running of the mill after it was erected, by the fact that there was a good deal of trouble about the water supply. He says: "The estimates of the people there who were in charge, Mr. Freeman especially, and Mr. Vildosolo, as to the amount of water which might be obtained by sinking,

were found to be mistaken. We did not have water enough to run the mill regularly, nor anything like it.''

It appears to be true that the ''slimming of the ore'' when the mill was started, as hereinafter set out, conjoined with the trouble about the water, was the cause of the disappointing final outcome, and the statement about water, therefore, may be considered nearer a misrepresentation than anything else set forth in the letter. But the statement lacks definiteness, is coupled with the warning that doubts had been entertained on the subject, and in its context and connection must after all have suggested that it could be, in the absence of actual experience with the supply of water, only an expression of opinion gathered from observation and the statements of others as to how the water facilities would eventually turn out. The other evidence about the water would seem to show that after the mill was running the managers of the mine found that the requirements of water could be met by piping it about four miles ''from the other side of the hills,'' which may have been ''the neighborhood'' of which Mr. Beaunisne spoke in his letter. But one of the further troubles incident to enterprises of this kind then intervened in the discovery that the supposed water right had been granted by a man who had not the title to it. We do not think this statement about water can be imputed to Beaunisne as a fraudulent misrepresentation.

Under date of March 30, 1903, the complainant, as a stockholder, received a letter signed by A. P. Ballou, secretary and treasurer. The concluding paragraph is: ''In a letter dated Feby. 24th Mr. Freeman informed us that he had secured four new mines for the company which will add to our mineral resources in Sonora. By establishing the present actual value of International stock at ten cents per share on each mine this company controls, stock would be valued at $1.60 per share. We would certainly recommend no lower figure than this except for purposes of development

and equipment on a larger scale." This was adverted to on the cross-examination of Ballou by complainant's counsel as though it were considered a false representation, but it seems evident, without explanation even, that it was a mere arbitrary valuation of such chances as the company had, and really meant nothing at all. With this communication to the stockholders from Ballou was enclosed a report from Chas. B. Gibson, the assayist who accompanied Mr. Beaunisne on his tour of inspection. It is addressed to Mr. Beaunisne as president of the company. Like the other pamphlets and documents produced, it is optimistic in its tone, but has no inherent evidences of bad faith or falsity in stated facts. It is to be noted, we think, that the difficulty about water was not overlooked altogether, for Mr. Gibson says: "It is also to be regretted that in this country there is a scarcity of timber and water in the immediate vicinity of the mines." He, however, afterward says: "So far as the water is concerned, that matter will take care of itself, for with depth, as is proven in two instances, the mines will provide enough for all requirements." But this, it would be apparent to everybody, was but the opinion of an expert that a difficulty would not be found insuperable—not a representation of fact put out by people with stock to sell.

There was also brought to Dr. Burwash's attention before his purchase, which he is now endeavoring to rescind, a printed postal card sent out by "The International Copper & Gold Company, A. P. Ballou, Sec. & Treas.," to the various stockholders, which was an enthusiastic prelude or foreword to a still more enthusiastic report soon sent around. Complainant points out as false in this postal card the statements, "We are mining large quantities of rich free milling ore," "This means early dividends," "Plenty of water for mill," and "Rich ore struck in ancient works on Pedregal." The first of these statements is coupled with the statement that this ore is

"for the forty ton mill now rapidly being completed,"
and the insufficient grounds of the opinion about the
quality and richness of the ore mined must have been
known to one as interested in the business and as-
siduous at the offices of the company as the complain-
ant, as well as to Mr. Ballou. The expression, "This
means early dividends," was clearly an expression of
opinion following an "estimate" of the "earning ca-
pacity of this first mill," which had not been erected,
and was nothing more than the belief of all the stock-
holders, undoubtedly, up to this time. The last two ex-
pressions purported to be parts of a telegram from
"C. F. Tolman, Jr., Supt.," and the authority being
given and no proof of bad faith in their repetition or
knowledge of their falsity or inaccuracy being shown
to exist in the defendants, it does not seem that they
should be imputed to them as misrepresentations.

The report in detail, of which the postal card was
the herald, duly followed. It was not signed, but
bears on its title page the names of all the officers and
management of the company, and may be assumed to
have been issued by them. It is addressed to Stock-
holders of the International Copper & Gold Company,
and the complainant says he received one before he
made his purchase of July 15th. This certainly is a
very enthusiastic description of opinions and expecta-
tions, with quotations from Mr. Freeman's and Mr.
Tolman's reports to the company, on various dates.
It is unnecessary to go over its statements separately.
They do not differ from those in the documents which
preceded it, and they do not, to our mind, show bad
faith or fraud or intentional misrepresentation, but
only the speculative hopefulness of the "promoter"
and "prospector." The gist of it all is, that the pros-
pects are very rich; that if the company has machinery
enough and capital enough it will reap millions in
profit, and that a small mill was recently purchased
and is in course of erection. It was plain until that
mill began to run, no certain ascertained facts of value
about the outcome of the venture would be known.

June 15, 1903, there was an annual meeting of the company held in Chicago. Dr. Burwash did not attend, but gave a proxy to Beaunisne and Ballou to vote his stock. June 28, 1903, Dr. Burwash invited Mr. Beaunisne to dinner at his house. Mr. Beaunisne says he was told that Dr. Burwash desired to interest some friends of his in the Mexican project, and that he went to oblige Dr. Burwash and did not try to sell him stock nor go there for that purpose. He met there Mr. Freeman, Mr. George Montgomery, and one or two other gentlemen, who never became connected with the company. As to what was said at that dinner, we must, under the rule laid down, assume the truth of Mr. Beaunisne's testimony where there is a difference between him and Dr. Burwash. So considered, the interview of that day between the parties certainly adds nothing to the alleged misrepresentations inducing the purchase of July 15th by the complainant. The story told by Mr. Beaunisne was simply what he had seen, colored with the roseate anticipations which everybody connected with the matter seemed to indulge in.

In July, 1903, from the 15th to the 24th (concerning the exact dates there seems to be some confusion), there was a meeting between Dr. Burwash, the complainant, and Mr. Ballou, the defendant, and Mr. George Montgomery and Mr. E. L. Montgomery, at the offices of the company, which resulted in another application on the part of Dr. Burwash for stock. Of this conversation, too, there are different versions by those who took part in it, in choosing between which we must, for the purposes of determining this appeal, accept the defendants'. So far as the prospects of the mines were concerned, which is what we are now alone considering, there is certainly nothing proven to have been said at this or other interviews which increased to any appreciable extent the sum of the representations and statements hitherto made and hopes hitherto held out. It was the same story. Ballou said,

and Dr. Burwash, with apparently the same opportunities for judging, believed, that soon there would be dividends; but as to one note, and one only, and that the last, the complainant made the stipulation that it was not to be payable until dividends had been declared. The same old story was told, too, of the great supply of ore on the dump and its supposed richness. But this could hardly have been new to Dr. Burwash after his continuous visits to the company's offices for the six months preceding. The really most significant fact is that practically admitted by Dr. Burwash, that at that time he knew and had heard from the officers of the company that the mill was not completed, and that there had been no ore run through it, and that the only knowledge of the character of the ore came from assays of samples and guessing at averages.

Dr. Burwash made an application for seven thousand additional shares, and received an agreement like that he had three times before taken for smaller amounts. This application and agreement and the resulting payments and obligations given by him are what he is now seeking to rescind and escape from. Their form and the representations concerning the origin and ownership of the stock we will discuss a little later, but as to the preceding statement of the defendants, written and oral, concerning the character and prospects of the mines which were controlled by this stock, it is here the place to repeat that we do not find in them a fraudulent intent or character, and that they seem to us like the usual utterances of over-enthusiastic mining adventures. They, therefore, furnish no cause for allowing a rescission of complainant's contract, although it was discovered afterward, when the milling began, that the slimness as a whole of the ore which was available, as well as the difficulties about the water supply, worked a great disappointment, and that the ore, as complainant testifies, did not run above $10 or $20 a ton, and no dividends have been

paid. Such is not the unusual event of golden expectations.

Counsel for appellant cite cases under the 17th Point of their brief to the proposition that, as the complainant had never visited the mines, the defendants' statements of the value of them were not representations of matters of opinion, but of matters of fact. The cases do not bear out this theory, and it would be unreasonable to expect them to do so. Neither the means of knowledge or of accessibility to knowledge which a vendee has, nor the lack of such means, can change expressions of opinion by a vendor to statements of fact, or statements of fact to expressions of opinion. Such means may impose on the vendee such obligations, under the rule of *caveat emptor,* that even representations of fact may not give him the right to rescind a contract which he has entered into in neglect of his opportunities to ascertain the truth; but the lack of them does not render enthusiastic predictions, falsified by the event, misrepresentations.

The application which the complainant signed for the seven thousand shares was in the same printed form, as we have said, as those in which he had applied for the stock previously bought by him. It was as follows:

"STOCK ORDER BLANK FOR SPECIAL ISSUE PRIVATE STOCK IN THE

INTERNATIONAL COPPER AND GOLD COMPANY,

Chicago Office: 1122 Merchants Loan and Trust Bldg.

This special issue of private Stock is Donated and sold in order to save treasury stock.

Ownership of stock in this Company means an interest in all of Its Mines.

Make all checks or drafts for stock from this fund payable to A. P. Ballou, Trustee.

Terms: Five equal monthly payments.

(308)

I hereby subscribe for seven thousand shares of fully paid and non-assessable stock of the International Copper & Gold Company, at one dollar per share,

less 20% discount, par value $1.00, for which I enclose One Thousand Dollars ($1,000) as first payment thereon, balance to be paid in sixteen equal monthly payments of $200.00 each, and one of fourteen hundred ($1,400) dollars respectively, on the 15th day of each and every month from date until fully paid. It it hereby agreed that the final payment of $1,400 may be deferred until paid by dividends accruing to the above stock, with interest at 5% per annum after maturity.

In case I fail to make my monthly payments regularly as above agreed, the Company may at its option cancel my application and issue to me fully paid stock in even shares for the money I have paid at the then price of said stock.

Name: H. J. BURWASH,
Address: 721 N. Hoyne Ave.
Date July 15, 1903.''

The agreement given to complainant was also in the same form as those theretofore received by him. It was headed: "Agreement for Stock in The International Copper & Gold Company," and was signed by Albert G. Beaunisne and A. P. Ballou, individually and not as officers of the company. It reproduced the application *in extenso* except the signatures, and certified that said application had been received and accepted, and that the contractors agreed to deliver the stock to the order of the said purchaser upon payment therefor according to the terms of the application.

The complaint of Dr. Burwash centers as much about representations concerning the ownership, origin and disposition of the proceeds of the stock thus contracted for by him, as it does about the alleged representations of the value of the property controlled by it.

The complainant alleges that it was represented to him by E. L. Montgomery, before he bought this seven thousand share lot, that "the company" had bought a large block of stock from one of the stockholders, who was about to throw it upon the market, and that

it could be bought for 80 cents a share; that Montgomery was the agent of the defendants; that he, Burwash, told Montgomery he would buy no private stock, but would go to the office of the company if he wanted to buy stock; that Ballou told him in connection with his various purchases of stock, that he, Ballou, was trustee for the International Copper & Gold Mining Company, and that all the money derived from the sale of the stock was to go into the treasury of the International Copper & Gold Company. In this the complainant was corroborated by George A. Montgomery, who took the stand and swore that at the conversation which culminated in the execution of the application and agreement dated July 15, 1903, both he (Montgomery) and Ballou said to the complainant that the International Copper & Gold Company owned the stock, and that the money from the sale of the stock would go to increase the development fund of the company. These statements, the complainant urges, were material misrepresentations, sufficient in themselves to justify and require the court to rescind the contract, for the facts were that it was not stock belonging to the company that Burwash was purchasing, but stock belonging to Beaunisne and Ballou (or possibly to Beaunisne, Ballou and DeGolyer), for whom, and not for the company, Ballou was trustee, and that the proceeds of the said stock were not to go into the treasury of the company, or into any fund of the company, and if they went to the development of the mines, went so only at the uncontrolled will and pleasure of the defendants, and could be withheld at the same will and pleasure. This and other contentions of the appellant concerning the character and validity of the stock bought by him, make it necessary at this point to advert to the history of the International Copper & Gold Company and the methods used by the defendants, who were its principal officers, to finance it. In August, 1901, the Santa Fe Copper & Gold Mining

Company was organized as an Illinois corporation by the two defendants, Beaunisne and Ballou, and one DeGolyer. Its capital was $10,000. Beaunisne subscribed for $3,400; each of the others for $3,300. The allegation of the bill is that a very small sum of money and some mining claims of very small value were all that was paid for the stock by the subscribers, but there seems to be no evidence about this in the record, and we deem it, in view of the subsequent history of the matters, immaterial. The company was undoubtedly capitalized, as is usual in the case of such corporations, by its acquisition of "prospects," in mining parlance.

It is to be borne in mind throughout that we are not dealing with the rights of creditors of the company, attacking the validity and substantiality of capital stock payments, but with those of fellow adventurers in a speculative enterprise, whose entrance into it was of different dates. It is not the question, therefore, of adequate payment of the capital stock we have to consider, but of the alleged fraudulent misrepresentations of the defendants. It is not shown, as we hold, that there was any concealment from or misrepresentation to complainant as to the payment of the capital stock of any of the companies involved or described in this litigation.

The Santa Fe Company was "protocolized" in Mexico, by which it seems to be meant that it was there authorized to do business by the government of the Republic of Mexico. In October, 1901, the Santa Fe Company made a contract with one Gad Freeman, a mining prospector and miner, to acquire certain mining claims in Mexico, and do certain work for certain considerations. In the same month there was filed in the office of the county recorder of the county of Maricopa in the Territory of Arizona, and in the office of the Secretary of the Territory of Arizona, a document, signed and sealed by Albert G. Beaunisne, A. P. Ballou and Frank G. DeGolyer, purporting to be Arti-

cles of Incorporation under the laws of Arizona of the International Copper & Gold Mining Company. The principal place of business in Arizona of said corporation by said articles was to be Phœnix, Arizona, and outside of Arizona, Chicago, Illinois, or such other place as the Board of Directors might by resolution direct.

Its purposes were ''to purchase, lease, bond, locate or otherwise acquire, own, exchange, sell, or otherwise dispose of, pledge, mortgage, hypothecate and deal in mines, mining claims, oil lands, mineral lands, oil, gas, asphaltum, petroleum, water and water rights, and to work, mine, explore and develop the same, to do a general real estate and mercantile business, to own, handle, control letters patent and inventions, to borrow money and execute mortgages or deeds of trust, to secure the same, to buy, sell, own and control stocks in other companies, and in general to do all things necessary to the proper conduct of the business of the corporation in the Territory and elsewhere, not inconsistent with the laws of the United States and the Territory of Arizona.''

The capital stock was to be $2,000,000, divided into two million shares of the par value of one dollar each. It was provided in the articles that at such time as the board of directors might by resolution direct, said capital stock should be paid into the corporation either in cash or by the sale and transfer to it of real or personal property for the uses and purposes of the corporation, in payment for which shares of the capital stock of the corporation might be issued, and the capital stock so issued should thereupon and thereby become and be fully paid up and non-assessable.

December 2, 1901, Beaunisne, Ballou and DeGolyer met in Chicago, and, purporting to act as stockholders of the International Copper & Gold Mining Company, elected as directors of that company themselves and A. S. Service, T. B. Smith, W. C. Heimbuecher and E. B. Tolman. At a meeting of said directors imme-

diately thereafter, Beaunisne was elected president of
the company, DeGolyer, vice-president, Ballou, secre-
tary and also treasurer, and Tolman, counsel. A seal
and stock certificate book were ordered for the cor-
poration. By-laws were adopted. A resolution was
then offered and adopted, which recited that Beaunisne,
Ballou and DeGolyer owned three described mining
claims in Colorado, and were also the sole owners of
the capital stock of the Santa Fe Copper & Gold Min-
ing Company, which was the owner of valuable min-
ing property in Mexico, and authorized to do business
therein, that said claims and stock were worth $2,000,-
000, and that Beaunisne, Ballou and DeGolyer, being
the sole subscribers to the stock of the International
Company, had offered said claims and said stock in
the Santa Fe Company in payment of their subscrip-
tion, and that the International Company had accepted
said mining claims and said Santa Fe stock in full pay-
ment of the said subscriptions.

Another resolution was then adopted, reciting that it
was desirable to have stock in the treasury of the
corporation to be sold for the purpose of obtaining
money to prosecute the business of said corporation,
and that, Beaunisne, Ballou and DeGolyer were de-
sirous of having money in the treasury so that the
value of their stock should be increased, and had
offered to transfer to said corporation, for the pur-
pose of raising money to prosecute the business of
said corporation, 1,000,000 shares in equal propor-
tions, and accepting said offer. Presumably to render
the stock more attractive to investors, however, and
to make that which should eventually remain in their
own hands more valuable, Beaunisne, DeGolyer and
Ballou, not in formal meeting of the corporation or of
its directors, but independently thereof, agreed to-
gether to donate some of their million retained shares
to a fund known among themselves, at least, as "The
Development Fund." They placed these shares in
the hands of A. P. Ballou, trustee for himself and

the two others, and from this fund of shares sales began to be made a year or so before Dr. Burwash became interested in the company. No account was kept in the company books of the proceeds or of the disposition of the proceeds of these sales, but Ballou kept books of account, as trustee, for himself and his two associates, of the receipts and disbursements of the fund. No detailed transcript from these books appears in the record, nor does it appear in the record how much money was realized from the sale of this original stock thus placed in Ballou's hands, as trustee, but Ballou testified (Rec. 601) that 373,083 shares of it were so donated and sold, and that all the proceeds went into acquiring titles to mines, getting mine machinery, and into salaries and wages, developments of the mines, and other expenses appertaining to the Santa Fe Company, in whose name the property stood and the work was being done in Mexico. A commission of 25 per cent. was allowed to all agents and others making sale of the stock, and this commission also was, at least sometimes, taken as an individual perquisite by Beaunisne, Ballou and DeGolyer when they personally made sale of any stock.

It would seem from the evidence in the record that contemporaneously with the International Company there existed a mining company, incorporated in the State of Wyoming, under essentially the same management and apparently with some common stockholders, called the Montana Copper & Gold Mining Company. It was capitalized at a million dollars in a million shares of the par value of one dollar each. Its holdings consisted of several mining claims in Montana with some development work and some machinery connected therewith.

April 30, 1902, a meeting of the directors of the International Copper & Gold Company was held, and a resolution adopted recommending to the stockholders of the International Company that the capital stock of the International Company be increased from

2,000,000 shares to 3,000,000; that the Montana Company stockholders be given an opportunity to exchange their stock for an equal number of shares of the increased capital of the International, and that said increase of stock be set aside and issued for the purpose of purchasing the outstanding Montana Co. stock and other properties. A memorandum was made by the directors, to be presented to the stockholders, of various advantages expected for the stockholders of both companies through the proposed action.

A special meeting of the stockholders of the International Company was called for May 14, 1902, in Chicago, and the recommendations of the directors were laid before it. The notice for the meeting specified the purpose to be only the increasing of the capital stock one million shares, but it would seem that the minutes of the directors' meeting were sent with the notice, which minutes contained the scheme and arguments before referred to. At the meeting of stockholders 426,013 shares were represented in person, and 442,534 shares were represented by proxies to Beaunisne. A resolution was unanimously adopted increasing the capital stock from 2,000,000 to 3,000,000 shares of the par value of a dollar each, and another that it was considered advisable to combine the International and Montana Companies under one management, and that the directors of the International be authorized and instructed to use the million of increase for the acquirement of the capital stock of the Montana Company and other property; that the Montana Company stockholders be offered an opportunity to exchange their stock for an equal number of shares of the increased capital stock of the International, share for share, and that said increase of stock be set aside and issued for the purpose of purchasing the outstanding Montana stock and other properties, and be issued full paid and non-assessable on receipt of proper transfer of said stock and properties to the International Company.

On the following day, May 15, 1902, the directors of the International Company met. They adopted a resolution issuing a million additional shares of stock as fully paid and non-assessable, as follows: "600,000 shares to the order of A. P. Ballou, Trustee, in exchange for 600,000 shares of Montana stock, representing a controlling interest in the outstanding stock of the Montana Copper & Gold Mining Company, and the additional 400,000 shares to the order of A. P. Ballou, Albert C. Beaunisne and F. G. DeGolyer, in consideration of the transfer to the International Company of a copper mining property in Missoula County, Montana," and on the further consideration "of the payment of all sums of money necessary to acquire the title to the Mexican properties then being acquired for the International Company by Freeman in Mexico, and of services in obtaining the same, and of the payment of all commissions for the sale of such stock and of the financing of the enterprise by the sale of such stock to a point of producing and treating the ores, thus accomplishing all these purposes with the proceeds of such stock without the issuance of any part of the million shares in the treasury."

It was stated and read into the minutes of the annual stockholders meeting heretofore alluded to as held on June 15, 1903, that 640,135 shares were required and used for the exchange of Montana stock, leaving 359,865 shares available for the development purposes to which Beaunisne, Ballou and DeGolyer had agreed to devote it. (The statement on Rec. page 643 that 373,083 was the number of shares donated to the trustee fund "of the increase," is apparently a typographical error for "prior to the increase." See Rec. page 601.) Beaunisne, at the same meeting, in a statement somewhat laudatory of himself and his two associate promoters, also copied into the minutes, said that the only difference between the transactions by which he and Ballou and DeGolyer contributed the stock of the original issue (373,083 shares), and that

by which they contributed the stock of the increased issue (359,865 shares) to the trustee fund in the hands of Mr. Ballou, was that "they made no agreement in regard to the original stock, but did what they did voluntarily and without assuming any obligation," but that as to the increased stock "they did assume the definite responsibilities mentioned." Mr. Beaunisne also said in that statement, speaking of the first fund of "donated" or "contributed" stock in Mr. Ballou's hands, "Everything done in this matter was done without any legal obligation on the part of the gentlemen named, and was a voluntary gift. While these gentlemen have never agreed not to sell any of their individual stock for their own benefit, yet they have refrained from selling any and shall continue so to refrain, except directly or indirectly for the interests of the company. It has been necessary, for the purpose of carrying out their plan and to secure the successful completion thereof, to sell a small portion of said private stock and use the money realized therefrom for purposes which, while not directly connected with the development of the company's properties, were yet equally important to its interests. For example, the question of transportation is one of the most vital questions affecting this company's prosperity. If the gentlemen referred to should have found occasion to devote a portion of their stock to the promotion of a railroad enterprise and the personal expenses incident thereto, the result of which would finally be to increase the value of the company's property tenfold, the stockholders certainly will be greatly benefited by such action on their part."

This plainly refers to the fact that Mr. Beaunisne, Mr. Ballou and Mr. DeGolyer, from the fund of original stock in Mr. Ballou's hands as trustee, or its proceeds, had expended $12,500 in getting a concession for a railroad enterprise in the Mexican mining country called the Southern Sonora & Alamos Railroad, in which they with some but not all of their associates in

the International Company were interested.    Mr. Ballou testified that the $12,500 was afterwards returned to the fund with a six thousand dollar increment from some source.    Mr. Beaunisne in his statement also, in speaking of the fund of increased stock, concerning which he and Mr. Ballou and Mr. De-Golyer had assumed definite responsibilities, says that if any portion should remain after the company's enterprise had been brought to the point of producing and treating the ores, "it would of course represent a partial compensation for their services, and for the property" (alluding to the Missoula County Copper Mining claim) "which they transferred."

Mr. Ballou testified that after the increase, the stock that was sold was "largely from the increase," the original being "tightly pooled—held intact with agreement not to sell by individual holders."    No account of the disposition of the proceeds of these sales of the increased stock in detail appears in the record, but Mr. Beaunisne's statement at the meeting of June 15, 1903, was supplemented by a so-called financial statement of Mr. Ballou, in which he·stated that to March 31, 1903, there had been received from the sale of "private stock"—whether of both funds or not does not clearly appear—over $138,000, and disbursed for the development of the mines and expenses of the company something over $96,000.    When he testified in the latter part of 1905, he said that including some money from the sale of the fund of original stock (what proportion does not appear), there had been realized from the sale of the increase stock since the increase about one hundred and eighty-three thousand dollars.    Generally he testified that all this money was expended for the account and benefit of the International Company.    "Thousands and thousands of dollars," he says at one point in his testimony, and "hundreds of thousands of dollars," he says at another, were sent to the Santa Fe Company in Mexico to do the work there.    Other uses to which

the money was put, claimed to be indirectly for the advantage of the International Company, will be hereafter alluded to.

Mr. Ballou claimed in his testimony that he and Beaunisne and DeGolyer had literally fulfilled the agreement involved in the acceptance of the increased stock under the resolutions of May 15, 1902, and detailed the work done in the different mining properties controlled by the International Company which had brought the enterprise "to the point of producing and treating the ores," conceding, however, that such production and treatment had not proved profitable.

It is not necessary for the decision of this case for us to express a favorable opinion of the method pursued in organizing, financing and carrying on this enterprise, as compared with a method which may be reckoned now as nearly if not entirely obsolete, of allowing all persons who wish to be associated together for the development of a particular undertaking to share proportionately to their ventures in its control and in its eventual profits or losses, and we express no such opinion. Nor is it necessary for us to yield our assent to the estimate evidently placed by themselves and their counsel on the defendants' alleged generosity and altruism in the scheme which they adopted for securing the money with which the first development of the mines was made. It is sufficient to say that the method, good or bad, is at present not an unusual, but on the contrary nearly the universal way of "financing" mining companies; a method that Dr. Burwash, with the experience which he admits in mining stocks, must have been acquainted with. If we are not mistaken, not even the plan of the "promoters" to sell, not treasury-stock eo nomine, but stock for that purpose placed in the hands of a trustee, can claim the merit of entire novelty. The plan was simple. For certain mining claims of their own— whose value until further developed was that of "prospects" only, and of course therefore speculative

—Messrs. Beaunisne, Ballou and DeGolyer, through the organization and subsequent action of these companies under their control, were to obtain, for absolute retention, we will say 600,000 shares of stock, plus whatever portion of the 250,000 shares of the stock exchanged for the Montana Company stock went to them. The rest of the 2,350,000 shares of the International Company which did not go to the Montana Company stockholders, amounting roughly to 1,750,000 shares, or as much of it as proved necessary, were to be devoted by them to the development of the prop-. erty, and all the various expenses of the company, among them the commissions and brokerage to be paid for the sale of these shares—by themselves as well as others. Thus if sales could be made at sufficient prices of this stock, and the expected good luck followed the expenditure of the proceeds in the development of the mines, the 600,000 shares retained would turn the original "prospects" which they represented into magnificent fortunes. It is pointed out that but 1,000,000 of these 1,750,000 shares were by original donation made treasury stock, and obligations formally contracted as to but 350,000 more, leaving say 400,000 shares, more or less, which the promoters contributed to the "development fund" out of pure philanthropy and generosity. But this is specious. Undoubtedly the promoters who originally subscribed for the stock of the International Company could have endeavored to sell the million dollars of treasury stock, *eo nomine,* and kept the rest from the beginning "tightly pooled," as Mr. Ballou testified it afterward became, but it is not likely that there was not reflected in the volume and in the net amount of the sales, the greater chance of profit for those investors who were not on "the ground floor," but on the next story, on account of the development fund of "private stock, donated and sold in order to save treasury stock," as the blanks used in its sale phrased it. This advantage for the investors, tending to the greater value of the stock and con-

sequently the propriety of a higher price, does not at
least seem to have been overlooked in the prospectus
and annual statements of the promoters and managers
of the company. The scheme had advantages for the
promoters or original subscribers, over one by which
the whole 1,750,000 shares should have been placed in
the treasury of the company. In the first place, as to
400,000 of the original stock, at any time it seemed
advisable the sale could be stopped and the so-called
donation ended. Of course the advantages in selling
the stock we have mentioned would then cease too, but
circumstances might so change as to render further
sales in order to secure money for development un-
necessary. The mines might have actually become
great producers. But even if all of the 750,000 shares
were thus sold to aid the development fund, there
would be advantages to the three promoters over a
donation to the treasury and a sale through it of the
same shares. The unlimited control of price and of
terms and of methods of sale, and especially the con-
trol of the manner in which those proceeds should go
to the development of the mines, which this method of
financing gave them, independently, of the directors
and stockholders of the company, was undoubtedly
much prized by them. It certainly was valuable. It
was used to enable them, with other persons, to ad-
vance temporarily from the ''development fund,'' so-
called, money that seemed likely to reap a heavy profit
in a railroad enterprise—a matter that Mr. Beaunisne
guardedly referred to in his statement of June 2, 1903,
by his note that ''if the gentlemen referred to should
have found occasion to devote a portion of their stock
to the promotion of a railroad enterprise and the per-
sonal expenses incident thereto, the result of which
would finally, be to increase the value of the company's
property tenfold, the stockholders certainly will be
greatly benefited by such action on their part.'' It
was also this railroad enterprise in which the agent,
George Montgomery, demanded so large an interest

as to lead to a permanent breach between him and the defendants and, in their belief, as it is more than hinted by them in their argument, indirectly to the present law suit.

Moreover, this same independence of control as to this "development fund" by the directors as stockholders, enabled Mr. Ballou, as trustee for himself and his two associates, to buy up for re-sale, using that fund for the purpose, the holdings "of a number of parties that were dissatisfied and hard pressed," presumably at a lower price than they were purchased at by those parties, and thus at the same time, if the stock could be resold, reserving more shares for the individuals who composed the "syndicate," and preventing the breaking of the public or quoted market for the stock. Among the shares thus purchased were 100,000 shares belonging to one Heimbuecher which were bought by Mr. Ballou as trustee June 30, 1903. Heimbuecher had received these shares out of the million increase and in exchange for Montana Company stock which he held. He had been or was a director of the International Company at the time of the sale. He told Mr Ballou he was negotiating for a sale of the stock, and after remonstrance from Ballou an agreement was made by which Ballou as trustee bought the stock for about $4,500 in cash, which was taken from the "development fund," and about $15,500 in notes of Beaunisne and Ballou. How those notes were paid does not appear, but it was sworn by Mr. Ballou that the proceeds of any Heimbuecher stock resold went into the development fund, so it may be presumed that the whole transaction was considered for the account of that fund, and the notes, if paid, were paid from that fund. It was 7,000 shares of this Heimbuecher stock that was sold to the complainant Burwash on July 15 or 24, 1903, at 80 cents a share, less a discount of about eight cents a share absolutely and 12 cents more conditionally. That is, in effect, he was to pay 72 cents a share if dividends to the amount

of 12 cents a share were ever paid on the stock, and 60
cents a share if dividends were not paid. It is this
purchase he is trying to rescind.

It must be repeated, that in determining his right to
such a rescission, we have no call to consider the rights
of creditors of the company under this scheme of or-
ganization and financing, if any such creditors there
be, nor to remark on the justice or injustice of the
eulogiums passed on themselves by the promoters of
it. We are, however, concerned with the charge made
by the complainant that his purchase was fraudulently
induced, not only by the expectations which we have
discussed and disposed of concerning the character of
the mines and their condition, but also by representa-
tions which were knowingly false regarding the char-
acter of the stock which he bought. It is alleged and
sworn to by him that he was told by Ballou for the de-
fendants, that this block of 7,000 shares of stock was
the property of the company, that it had been bought
for the company from a stockholder, and that the pro-
ceeds would go into the treasury of the company and
from there to increase the capacity of the mill the com-
pany was putting up. This testimony was confirmed
by that of George Montgomery, the agent of the com-
pany, of whom mention has been made. Mr. Mont-
gomery swears that at a meeting of himself and Mr.
Ballou and Dr. Burwash, together with E. L. Mont-
gomery, at the office of the company just previous to
the purchase, these representations were made. Mr.
Ballou, on the other hand, explicitly denies them, and
asserts that he represented nothing about the owner-
ship or character of the stock contrary to the truth.
It might be sufficient to call attention again to the rule
with which we prefaced the opinion, about our inter-
ference with the judgment of a chancellor who decides
on conflicting evidence, but as two witnesses in this
case are opposed to one, it may be proper for us
to point out some things which fortify the chancellor's
evident view of this evidence. In the first place a very

heavy discount must certainly be made from the weight of Mr. Montgomery's testimony. At the time he says he heard this conversation he must have known that it was very unlikely to be true that the company was buying stock from a treasury which was empty and never had anything but a million shares of its own capital stock in it, and equally unlikely that if not bought from the treasury funds, but from the "trustee" or "development" funds, the shares bought from Heimbuecher would go into the treasury, instead of following into the hands of A. P. Ballou as trustee for the promoters all the "donated" stock and stock sold for the benefit of the company. That he knew of this condition of things as to the treasury and as to the stock he had been so influential in selling, is apparent from his relations to the company and to the parties concerned, and from the fact that he had repeatedly been asked to sign and had signed minutes of directors' and stockholders' meetings, in which the general scheme of financing this company and the fact that its treasury had nothing to do with it, was emphasized. To suppose that he knew nothing of the nature of what he signed is inconceivable to us. Yet he made no correction of the alleged statements, and he says he knew of no difference between the company and Ballou as trustee, but considered them all as one institution. In addition, at the time he was testifying, his hostile animus to the defendants and the reason therefor are apparent.

As to the testimony of Dr. Burwash as compared with that of Mr. Ballou, there is this to be said: Mr. Ballou's version of the conversation on this point is the more probable. There could not have seemed any advantage to Mr. Ballou in making a representation so contrary to the fact as that the company was the owner of the shares, when at any meeting of the stockholders or by any examination of the books which any stockholder had the right to make, the falsity of it could be discovered by Burwash. It was much more

natural for Ballou to explain again and dilate on the advantages of a system of financing which left all treasury stock intact—a boast which must have been brought to Dr. Burwash's attention often when the interest which he took in the company is considered.

Again, the form of application which Dr. Burwash signed and the form of agreement which he received, and of the notes and checks he signed—the same that he had signed and received three times before—were inconsistent, and upon the slightest examination could be seen to be inconsistent, with the representations which he alleges, and Ballou denies, were made. It is true that the application and agreement are not altogether consistent with themselves, and that the word "subscribe" in the application, as applying to the purchaser's contract and the provision that "the company" might at its option, in certain contingencies, cancel the application, are not apt, in a contract between the private owners of stock and a would-be purchaser, and that the explanation given by Mr. Ballou for the presence of these terms is rather lame and obscure. But, on the other hand, there are particular notices in the application, that the stock is "private stock," sold to save "treasury stock," and that checks and drafts for stock from "this fund" should be made payable to A. P. Ballou, trustee. The agreement which was given Dr. Burwash was signed by Albert G. Beaunisne and A. P. Ballou individually, not as officers of the company, and certified that "we agree to deliver said stock to the order of the purchaser," etc.

Moreover, Dr. Burwash's testimony shows, to our mind, some evidences of inaccuracy, through mistaken recollection or otherwise, in such matters as whether he heard the minutes of the June, 1903, meeting read at the meeting in June, 1904, as to the reiteration of the full name of the company every time it was alluded to by Mr. Ballou, as to the exhibition to him of a photograph of an assay office in July, 1903, and as to his

never hearing that commissions were paid on the sale of stock until July, 1903. While not, perhaps, material in themselves, these matters may have influenced the chancellor in weighing the testimony. We cannot say that he erred in taking, as we must assume he did if it is necessary to affirm his disposition of the case, Mr. Ballou's version of the conference preceding the purchase here sought to be rescinded.

We have thus, at such length and in such detail gone over the alleged representations, alleged to have been made with actual fraudulent intent, to the injury of the complainant, and as an inducement to his purchase, because we deem them the gist of this case. Fraud, actual fraud, involving moral turpitude, vitiates, in transactions of this kind, every contract which it contaminates, and if we had found such fraud here we should not have been obliged to pass upon the more technical grounds of rescission urged by the complainant. As we have not found it, however, we must turn to their consideration. They also are concerned with the character of the stock bargained for by the appellant—some of them, perhaps it would be more accurate to say, with its existence. The appellant urges that he endeavored to purchase stock in a corporation which was really non-existent; that this involves a right to rescind because of the entire want or failure of consideration. Appellant claims that the International Copper & Gold Company is not a corporation under the statutes of this State, and that there is no presumption of its existence by the law of any other; that to establish such a presumption substantial compliance and operation under such foreign law must be proven; that no such compliance or operation were proven in this cause; that although alleged to be an Arizona corporation, the International Company never had a meeting of its incorporators or stockholders in Arizona, a fact in itself sufficient to show that it was never actually incorporated. It is insisted in addition to this that, having been organized

in one jurisdiction to carry on business entirely in others, it cannot be recognized as an existent corporation.

Again, it is said that even if the entire stock of the International Company be not non-existent, it is worthless—not full paid and non-assessable as represented, but unpaid and in a company whose charter and assets are now subject to forfeiture. Into this, the appellant claims, he was erroneously prevented by the court below from prosecuting a full inquiry, but that enough appears to show that the original issue of stock was for worthless mining claims and worthless stock in another company, which it had no right to hold; that the Santa Fe Company stands also, by virtue of its sale of its stock to the International Company, under the shadow of a potential forfeiture which would practically obliterate any value in the alleged present assets of the International Company, and that such worthlessness of the International stock gives to the appellant a right of rescission.

Further, it is claimed that irrespectively of the character or validity of the two million shares of the International stock originally issued, the increased stock voted to the stockholders of the Montana Copper & Gold Mining Company, of which the 7,000 shares here involved were a part, was invalid and non-existent because such an increase could be legally made only by the stockholders assembled in a valid meeting, and that a meeting of the International Company to be valid must be in Arizona. Moreover, it is claimed that the increase must be authorized by a vote of the majority of stockholders, as well as of the shares of stock, and that there was no provision by the statutes of Arizona (which must govern), or by any valid by-law, for any vote by proxy; yet that the vote for increase in this case was not by a majority of stockholders nor of a majority of the stock, unless proxies were counted. It is also alleged that there was no publication and recording of

the increase, as required by the statute of Arizona. Finally it is said that the consideration for which the International Company parted with the increase was illegal and rendered the stock void and invalid. Six hundred thousand shares were exchanged for the Montana Company stock, which the International Company could not legally hold, and the other 400,000 were taken by the defendants and DeGolyer for services to be performed in the future, of the value of which services they constituted themselves the only judges. Both considerations were illegal, and the illegality of either makes the million of shares invalid and void.

We have run through these claims of the appellant thus, that it may be seen that we have not overlooked any of them. He has cited to each of the subsidiary propositions looking to the illegality and invalidity of the proceedings, many authorities. But it must again be noted that we are concerned with the various irregularities claimed, only as they affect the contract of a purchaser of a portion of the increased stock from antecedent holders who did not conceal or misrepresent the facts concerning the organization—the contract of a purchaser too, who knew, or by the exercise of plain rights as an existing stockholder might have known before he made this particular purchase, all that he knows now about the organization and capitalization of the company, and who had previously, through an attorney in fact, deliberately appointed, voted to confirm, ratify and approve all that had been done as to such organization and capitalization, both in respect to the original issue and the increased issue of stock.

At the stockholders' meeting June 15, 1903, a resolution was unanimously carried, the complainant's proxy being voted therefor, approving the action and policy of the then board of directors and of the officers during their term of office, and thanking them for their efficient services. There had been no change in officers or directors, except the retirement of director Heim-

buecher, since the directors' meeting which voted the original issue of International stock for the mining claims and Santa Fe stock belonging to Beaunisne and Ballou. All the business of increasing the capital stock and disposing of the increase had also been transacted by these officers and directors.

This is not an action by a stockholder against such directors or officers, calling them to account for alleged misdoings; it is not an action involving the rights of either creditor or stockholder; it does not affect the company in any particular; but it seeks to rescind a contract because of irregularities which the appellant knew and condoned, but which he now insists prevent the very subject of the contract from having an existence, and therefore prevents his contract from being enforceable.

We do not agree with him. We think that there was a corporation *de facto* at least, for the shares of which this contract was made. We think the appellant is not in a position to question, in connection with this contract, the matters he complains of. This is the conclusion to which the principles laid down in cases like Handley v. Stutz, 139 U. S. 417; Dallas Co. v. Huidekoper, 154 U. S. 654-55; Lawyers Co-op. Ed. 974; Chubb v. Upton, 5 Otto 665; Harter v. Elzroth, 111 Ind. 159; People's Bank v. Kurtz, 99 Pa. St. 344; Mann v. Williams, 143 Mass. 394; Rice v. Rock Island & Alton R. R. Co., 21 Ill. 93; and indeed Hudson v. Green Hill Seminary, 113 Ill. 618 (although this last case is much insisted on by appellant as an authority), have irresistibly led us. We concede that the situation treated in those cases was not the same as in this, and we have not overlooked the arguments by which counsel for appellant have distinguished them and have urged their inapplicability to the facts involved in this litigation. We have endeavored to give those arguments a fair consideration, and in that endeavor we have examined with care the wealth of authorities to which counsel has

cited us. It would be unjustifiable to further extend this opinion by their discussion and analysis. Sound in principle as they are as applied to the facts of the cases in which the various opinions were written, they do not seem to us to declare general principles or doctrines inconsistent with those which, deduced from the cases we have named, have governed our decision herein.

The decree of the Circuit Court is affirmed.

*Affirmed.*